# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-04-2220 |
| | § | |
| AIR AMBULANCE BY B&C FLIGHT | § | |
| MANAGEMENT, INC., B&C FLIGHT | § | |
| MGMT, INC., AND ROY G. HORRIDGE, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

In this suit on an unpaid commercial note and related guaranty, the lender, Whitney

National Bank ("Whitney Bank"), has filed an amended complaint against Roy G. Horridge,

the sole shareholder, president, and operator of the borrower, Air Ambulance by B&C Flight

Management, Inc. ("Air Ambulance").  Horridge executed the loan documents as president

of Air Ambulance, and as an individual guarantor and the sole shareholder, president, and

operator of B&C Flight Management, Inc. ("B&C Flight Management"), which owned the

aircraft and held the FAA license that allowed Air Ambulance to operate.  Whitney Bank

asserts causes of action for breach of contract, fraud, and fraudulent transfer under Texas

law.  Horridge has counterclaimed, alleging tortious interference and fraud and asserting that

Whitney Bank's disposition of the aircraft securing the loans was not commercially

reasonable.

The following motions are pending:

- Horridge has moved for partial summary judgment as to Whitney Bank's fraud claim.  (Docket Entry No. 134).   Horridge argues that Whitney Bank disclaimed reliance on extracontractual representations in the loan agreements and guaranties.  Whitney Bank has responded.  (Docket Entry No. 152).

- Whitney Bank has moved for partial summary judgment as to Horridge's tortious interference and fraud counterclaims.  (Docket Entry No. 136).  Whitney Bank argues that to the extent Horridge bases his tortious interference claim on injunctions entered in this case that prevented him from selling the company to a third party, the claim fails because Horridge agreed to the injunctions and because Horridge has failed to present or identify evidence to raise a fact issue as to tortious interference.  (*Id.*).  Horridge responds that Whitney Bank induced him to agree to the injunctions by fraudulent representations and that he was under economic duress.  (Docket Entry No. 154).

- Whitney Bank has moved to exclude the testimony of expert witnesses Horridge designated as to whether the sale of the aircraft pledged as collateral for the loan was commercially reasonable and has moved for summary judgment on the deficiency claim.  (Docket Entry No. 139).  Horridge has responded, asserting that the record raises disputed fact issues material to determining whether the collateral was sold in a commercially reasonable manner.  (Docket Entry No. 153, 154).

2

Based on careful consideration of the pleadings; the motions and responses; the parties' submissions; and the applicable law, this court denies Horridge's motion for partial summary judgment as to Whitney Bank's fraud claim (Docket Entry No. 134); grants Whitney Bank's motion for partial summary judgment on Horridge's counterclaim for tortious interference (Docket Entry No. 136); and grants Whitney Bank's motion for partial summary judgment on Horridge's counterclaim for fraud (Docket Entry No. 136). Whitney Bank's motions for partial summary judgment on the deficiency claim and to exclude Horridge's expert witnesses (Docket Entry No. 139) are addressed in a separate memorandum and opinion.

The reasons for the rulings on the fraud and tortious interference claims are explained below.

## I.  Background[1]

---

[1]  The record includes the loan documents: Commercial Note, First Amended and Restated Commercial Business Loan Agreement, (Restated) Continuing Guaranty, Ratification of Previously Executed Security Agreements, and Aircraft Security Agreements, two dated  November 20, 2002, the others dated March 19, 2002, May 21, 2003, and July 25, 2003.

The record also contains correspondence between Horridge and Whitney Bank representatives, including a June 2, 2004 notification of default, June 4, 2004 notification that the Commercial Note was accelerated,  several letters about the loan after the notification of acceleration,  and documents relating to the deficiency sale of the aircraft securing the loan.

The record contains FAA documents relating to Horridge's companies, including letters, an FAA Emergency Order of Suspension dated May 20, 2004, an FAA Emergency Order of Revocation dated June 2, 2004, and a FAA Settlement Agreement dated June 17, 2004.

The record also contains excerpts from the depositions of Horridge, Daniel Forgy, Air Ambulance's accountant, John "Tex" Garner, an Air Ambulance employee, George Crow, Air Ambulance's attorney, Brian Ingraham, designated by Horridge as an expert witness on the commercial reasonableness of the sale of the aircraft, and Jerry Schweiner, a third-party businessman.  The record also contains affidavits by Phil Whitham, vice-president of Whitney Bank, and Horridge.

Roy Horridge started buying and selling used airplanes in 1962.  (Docket Entry No. 136, Ex. C at 57).  In 1968, Horridge started an "air taxi" business.  In 1970, he started an "air ambulance" business based in Kansas City, transporting people to medical facilities in Houston.  (*Id*. at 58, 65).  In the mid-1970s, Horridge bought part of one Missouri bank and all of another.  (*Id*. at 61–62).  Horridge was a bank officer from 1976 to 1990.  (*Id*. at 63).  In 1990, Horridge formed a consulting company that he owned and operated, B&C Flight Management, Inc.  Horridge used B&C Flight Management as the holding company to own the aircraft and to hold the air carrier operating certificate.  (*Id*. at 71, 73, 100–01).  The aircraft were used in Horridge's air ambulance business, which was incorporated as Air Ambulance by B&C Flight Management, Inc.  (*Id*. at 73, 100–01).

Starting in 2002, Whitney Bank made several loans to Air Ambulance, secured by aircraft owned by B&C Flight Management as well as by Horridge's personal guaranty.  (Docket Entry No. 136, Exs. B-5 to B-10).  The aircraft that were subject to the security agreements were two Cessnas and six Lear Jets.  (*Id.*, Ex. C at 107–09; Ex. K-1).[2]  As of April 2004, Air Ambulance's outstanding indebtedness to Whitney Bank exceeded $4.5 million.  Air Ambulance also had outstanding loans with Bank One secured by other aircraft.  (*Id.*, Ex. C at 107–08; Ex. K-1).

---

[2]  The Cessnas had registration numbers N 5EU and N 42ML; the Lear Jets had registration numbers N 860MX, N 140 GC, N 251DS, N 988AS, N 535TA, and N 9108Z.  (Docket Entry No. 136, Ex. B-4 to B-9; Ex. K-1).

The FAA requires that every airplane have an FAA-issued airworthiness certificate. In March 2004, the FAA started investigating the airworthiness of Air Ambulance's aircraft. (Docket Entry No. 136, Ex. C at 154–55). By April 2004, Horridge had voluntarily shut down Air Ambulance's operations to allow the FAA to inspect the planes. (*Id*. at 169–71). On May 3, 2004, the FAA sent Horridge a letter identifying "serious deficiencies" in the maintenance of the Lear Jets and demanding that the aircraft be reexamined to evaluate their airworthiness. (*Id.*, Ex. K-3). In his deposition, Horridge testified that despite this letter, he did not believe the airworthiness certifications—which are necessary for the aircraft to fly and for the company to operate—were in jeopardy because he had received a similar letter in the past. (*Id.,* Ex. C at 171).

In April 2004, Horridge asked Whitney Bank to loan Air Ambulance an additional $1 million and to refinance the existing loans. Horridge did not tell Whitney about the FAA investigation. (Docket Entry No. 136, Ex. C. at 213–14). On May 7, 2004, Whitney Bank made an additional $1 million loan to Air Ambulance and renewed and extended the existing debt. The May 7, 2004 loan documents included the Commercial Note signed by Horridge as president of Air Ambulance; the First Amended and Restated Commercial Business Loan Agreement signed by Whitney Bank and Horridge as president of Air Ambulance, individually as a guarantor, and as president of B&C Flight Management, another guarantor; a (Restated) Continuing Guaranty signed by Horridge individually and as president of B&C Flight Management; and a Ratification of Previously Executed Security Agreements executed by Horridge as president of B&C Flight Management; and five Aircraft Security

Agreements, two dated November 20, 2002, the others dated March 19, 2002, May 21, 2003, and July 25, 2003, and covering eight aircraft (six Lear Jets and two Cessnas).  (*Id.*, Exs. B-1 to B-9; Ex. K-1).[3]

The nine-page composite Commercial Note stated that it "represents a renewal, extension, increase and rearrangement, but not a novation, of those certain promissory notes left due and owing by the Borrower, including that one certain promissory note, in the original principal amount of $1,453,519.31, dated March 19, 2002, that one certain promissory note in the original principal amount of $2,100,000.00, dated November 20, 2002, and that one certain promissory note in the original principal amount of $1,250,000.00, dated May 21, 2003, and that one certain promissory note in the original principal amount of $1,315,000.00, dated July 25, 2003, each extended by the Borrower and payable to the order of the lender."  (Docket Entry No. 136, Ex. B-1 at 3).  The Commercial Note was in the amount of $5,685,597.00.

In the May 7, 2004 Loan Agreement executed in connection with the Note, Horridge, signing as the borrower's president and sole shareholder, stated that the loan proceeds were to be used solely for the purpose of refinancing the existing loans and to fund $1 million to purchase another air ambulance company, Able Air Ambulance, Inc. (Docket Entry No. 136, Ex. B-2, ¶ C).  Horridge and Air Ambulance did not use the $1,000,000 loan proceeds to

---

[3]  The first security agreement pledges the two Cessnas, N 5EU and N 42ML, and one Lear Jet, N 860MX.  (Docket Entry No. 136, Ex. B-5 at 1).  The second agreement pledges the Lear Jet N 9108Z.  (*Id.*, Ex. B-6 at 1).  The third security agreement pledges the Lear Jet N 140GC.  (*Id.*, Ex. B-7 at 1).  The fourth security agreement pledges Lear Jet N 535TA.  (*Id.*, Ex. B-8 at 1).  The fifth security agreement pledges Lear Jets N 988AS and N 251DS.  (*Id.*, Ex. B-9 at 1).

acquire Able Air Ambulance, Inc.  Instead, the money was used to pay day-to-day expenses of Air Ambulance and B&C Flight Management.  (*Id.*, Ex. C at 219).

Horridge reaffirmed the warranties and representations in each of the earlier Aircraft Security Agreements in the Ratification of Previously Executed Security Agreements. (Docket Entry No. 136, Ex. B-4).  The Security Agreements specifically stated that B&C Flight Management would keep the aircraft in "such condition as may be necessary to enable the airworthiness certification of the Collateral  to be maintained in good standing at all times."  (*Id*., Exs. B-5 to B-9).  The Security Agreements specifically represented the condition of the planes and their engines, maintenance, and airworthiness.  (*Id*.).  The Security Agreements defined a condition of default to include any failure to perform any agreement made to the Secured Party.  (*Id.*).

The loan documents included representations as to the financial condition of Air Ambulance, (*id*., Ex. B-2, ¶ 3), limited Air Ambulance and B&C Flight Management's ability to merge with other companies and sell stock, (*id*., ¶ 4), limited Air Ambulance and B&C Flight Management's ability to obtain additional loans, (*id*., ¶¶ 5, 6), and required Air Ambulance and B&C Flight Management to maintain specific cash flow to debt, debt to tangible net worth, and current asset to current liability ratios, (*id*., ¶ 8).

According to Whitney Bank, approximately two weeks after the May 7, 2004 execution of the Commercial Note and related loan documents, Horridge told Whitney Bank that because of the FAA investigation, he had shut down his business and that Air Ambulance's aircraft were not allowed to fly.  (Docket Entry No. 136, Ex. B, ¶ 12). Horridge

7

later told Whitney Bank that he had voluntarily stopped operating the aircraft in April 2004, before the May 7, 2004 loan documents were executed. (*Id.*). Whitney Bank also learned that Horridge, B&C Flight Management, and Air Ambulance had not used the $1 million loan proceeds to acquire Able Air, but instead for day-to-day operations. (*Id.*, ¶ 13).

The FAA requires an aircraft owner to maintain an accurate record of the accumulated operating "times"—the amount of time the aircraft has flown—and "cycles"—the numbers of flights or takeoffs and landings—to meet regulations. On May 20, 2004, the FAA issued an emergency order suspending the airworthiness certificates for Air Ambulance's eight Lear Jets. (Docket Entry No. 136, Ex. K-9). The FAA found numerous critical problems in the flight and maintenance records for each of the Lear Jets, stating that the times and cycles shown in the B&C Flight Management records were "not correct because they were fabricated by B&C or were derived from data taken from fabricated B&C documents." (*Id.* at Counts I–VIII). The FAA determined that "the company has not been recording all of the flight time for any of the aircraft, and it has systematically reduced the numbers of hours and cycles on them, resulting in required maintenance and inspections being significantly delayed or omitted and the aircraft being unairworthy. The true total time and cycles, which trigger maintenance actions for these aircraft, are unknown. Therefore, this action is taken to suspend the airworthiness certificates of the aircraft . . . until such time as the FAA can determine that they have been returned to conformity with their type certificates." (*Id.*, Determination of Emergency).

8

On June 2, 2004, the FAA issued an emergency order revoking B&C Flight Management's Air Carrier Certificate based on "consistent findings of deceptive, false record keeping." (Docket Entry No. 136, Ex. K-10). The FAA found that B&C Flight Management had "made, or caused to be made, entries in the maintenance records of all the Learjet aircraft on its operations specifications . . . [that] were false and designed to mislead . . . . These false statements include, but are not limited to, reduced numbers of hours on the aircraft, reduced numbers of cycles on the aircraft, statements that required inspections had been accomplished when they hadn't been, and entries reciting the accomplishment of Airworthiness Directives (ADs) that had not been done." (*Id.*, Determination of Emergency). The FAA found that B&C Flight Management had operated the aircraft without "complying with required maintenance inspections, without complying with applicable airworthiness directives, and without replacing life limited parts in a timely manner. . . . B&C operated the aircraft when they were not in an airworthy condition. . . . The entries were false and designed to mislead the FAA. . . . B&C operated these aircraft with management's full knowledge of these type falsifications and in complete disregard of the danger these unairworthy aircraft presented to the public and the crews that operated them." (*Id.*, Ex. K-10). Air Ambulance was unable to operate a plane legally without an airworthiness certificate for that plane and an air carrier certificate for B&C Flight Management.

On June 2, 2004, Whitney Bank notified Air Ambulance of its default under the loan agreement based on the FAA actions. On June 4, 2004, Whitney Bank accelerated the May 7, 2004 Commercial Note. (Docket Entry No. 136, Exs. B-10, B-11). On June 7, 2004,

Whitney Bank filed this suit against Air Ambulance, B&C Flight Management, and Horridge, seeking a temporary restraining order to prevent Horridge from transferring or damaging the aircraft that served as collateral for the loan. (Docket Entry No. 1).[4] This court entered a temporary restraining order sequestering the aircraft. (Docket Entry Nos. 3, 4). On June 24, 2004, this court entered an agreed preliminary injunction preventing Horridge from transferring or damaging the aircraft and transferring possession to Whitney Bank. (Docket Entry No. 15). On July 15, 2004, Whitney Bank sought and obtained another temporary restraining order, prohibiting Horridge, Air Ambulance, and B&C Management from transferring any assets. Whitney Bank based its application for this expanded TRO on evidence that it had discovered new information about Horridge's past and present asset transfers, bankruptcy filings, and other litigation, which Whitney Bank claimed were fraudulent. (Docket Entry No. 18). That temporary restraining order was extended on an agreed basis on July 22, 2004. (Docket Entry No. 27).

On June 17, 2004, B&C Flight Management reached a settlement agreement with the FAA. The FAA withdrew the order suspending the airworthiness certificates for the eight Lear Jets but "retained custody" of the certificates; the planes could not be flown. Under the agreement, B&C Flight Management was to make a proposal to revise the records of

---

[4]   On November 14, 2005, Whitney Bank dismissed its claims against Air Ambulance and B&C Flight Management. (Docket Entry No. 57). Whitney Bank later added as a defendant Horridge's former wife, alleging fraudulent transfer of assets. The claims involving Horridge's former wife have been resolved through settlement.

takeoffs, landings, and hours in flight for each aircraft, to bring the records into compliance with the FAA regulations.  The FAA would then decide whether to approve the proposal for adding a specific number of hours and cycles to the records of each aircraft, including approval of the method used.  If the FAA issued the approval, and if the plane had the additional necessary maintenance work performed, and if that plane then passed FAA inspection, the airworthiness certificate for that plane would be returned.  (Docket Entry No. 136, Ex. K-14).  If any airworthiness certificate had not been returned to the owner within one year of June 17, 2004 settlement agreement, the FAA could suspend that certificate. Pending the work under the settlement agreement, the FAA did not return the airworthiness certificates to B&C Flight Management.  As a result, the planes were not commercially operable.  As part of the settlement agreement, the FAA also insisted that Horridge could not be involved in operating B&C Flight Management or in "any related activity."  (*Id.*, ¶ 14). Whitney Bank was not a party to the Settlement Agreement.  The Settlement Agreement acknowledged that the aircraft were subject to a writ of sequestration in a lawsuit instituted by Whitney Bank, and stated that B&C Flight Management was attempting to sell the aircraft "and/or its remaining operations to one or more unrelated parties, who pursuant to any such transaction will work with the FAA under the terms of this Order and agreement to return the Aircraft to service."  (*Id.*).  The Settlement Agreement did not refer to any obligation on the part of Whitney Bank to work with the FAA.

Horridge counterclaimed against Whitney Bank, alleging tortious interference with a contract he had been negotiating with a third party, Jerry Schweiner, to sell Air Ambulance.

(Docket Entry No. 136, Ex. K-4).  On June 28, 2004, Schweiner submitted a revised offer to purchase Air Ambulance.  That offer was based on an assumption that Dan Forgy, a CPA working for Air Ambulance, was the sole owner, not Horridge.  (Docket Entry No. 136, Ex. K-20).  On June 28, 2004, Horridge executed a proxy that appointed Forgy as his "attorney in fact" who would have "full power and authority to exercise all rights of ownership" with respect to Air Ambulance and B&C Management.  (*Id.*, Ex. K-19).  Horridge testified that "Dan [Forgy] had somebody prepare [the proxy] so that he could act on behalf of the corporation trying to work with Whitney Bank and other borrower—or lenders."  (*Id.*, Ex. C at 98).  On June 30, 2004, Schweiner sent Air Ambulance an email explaining why he did not want to continue the negotiations to purchase Air Ambulance.  (Docket Entry No. 136, Ex. K-21).  On July 5, 2004, Schweiner wrote a letter terminating his relationship with Air Ambulance.  (*Id.*, Ex. K-23).

On August 19, 2004, Whitney Bank notified counsel for Air Ambulance, B&C Management, and Horridge that it intended to conduct a private sale of the aircraft securing the loan.  Horridge transferred his Air Ambulance stock to Forgy on August 19 or 20, 2004.  (Docket Entry No. 136, Ex. C at 92–93).  Shortly thereafter, Air Ambulance declared bankruptcy.  Whitney Bank obtained relief from the bankruptcy stay in February 2005 and sold the collateral in a private sale conducted with sealed bids.  The deficiency exceeds $4.5 million.  (Docket Entry No. 136, Ex. B at 7).

In his counterclaim, Horridge alleges tortious interference with an existing and prospective contract with Schweiner.  Horridge alleges that he was unable to close the

transaction with Schweiner because of "the injunction obtained by Whitney Bank herein that prevented [Horridge] from transferring the shares." (Docket Entry No. 91, ¶ 44). Horridge alleges that Air Ambulance was not in default, despite the FAA actions that qualify as an event of default in the loan documents. Horridge also claims that Whitney Bank "demanded and required that Mr. Horridge transfer his shares in Air Ambulance to Air Ambulance's CPA, Don Forgy, for zero consideration before it would release the airplanes," (*id.*, ¶ 45), and that "Whitney Bank seized several Air Ambulance airplanes that it had no security interest in and retained them even after Mr. Horridge pointed out this discrepancy," (*id.*, ¶ 46).

Horridge has moved for summary judgment dismissing Whitney Bank's fraud claim. Whitney Bank has moved for partial summary judgment dismissing Horridge's counterclaims for tortious interference and for fraud. Each motion is analyzed below.

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden

of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. App'x 798, 800 (5th Cir. 2005).

14

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. App'x at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III.    Horridge's Partial Summary Judgment Motion as to Whitney Bank's Fraud Claim

Whitney Bank alleges that Horridge committed fraud in obtaining the May 7, 2004 loan by, among other things, misrepresenting the condition of the aircraft securing the loan, failing to disclose the FAA's investigation, misrepresenting the intended use of the new loan proceeds, failing to disclose Horridge's prior bankruptcy, overstating Horridge's personal assets, and failing to disclose a prior conviction.  (Docket Entry No. 88, ¶ 25).  Horridge has moved for summary judgment on Whitney's fraud claim, (Docket Entry No. 134), and Whitney Bank has responded, (Docket Entry No. 152).  Horridge argues that the merger clauses in the loan documents and guaranties bar Whitney Bank's fraud claim under Texas law.  (Docket Entry No. 134 at 4–7).  Whitney Bank responds that Texas law allows a "fraudulent inducement exception" to merger or disclaimer clauses that otherwise limit liability.  (Docket Entry No. 152 at 3).

### A.    The Applicable Case Law

15

In this case, jurisdiction is based on the parties' diversity, (Docket Entry No. 88, ¶ 4), and the loan documents specify that Texas law applies, (Docket Entry No. B-1 at 3). The elements of a fraud claim under Texas law are "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng's & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). In *Prudential Insurance Co. of America v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160–62 (Tex. 1995), the Texas Supreme Court held that "as is" clauses were enforceable unless the buyer was induced to enter into the contract by a fraudulent representation or concealment. In *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), the Texas Supreme Court held that in an appropriate case, a disclaimer clause contained in a release can preclude a claim that the contract was fraudulently induced. "The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding." *Id.* at 179–80.

*Schlumberger* involved a joint venture to mine diamonds. Complications hampered the project. For thirteen months, the parties negotiated for a buy-out and for new joint-venture terms. Schlumberger convinced the other party to sell its interest, which Schlumberger resold at a significant profit. The release contained a disclaimer clause stating that "none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment." *Id.* at 180. The other party sued, claiming that Schlumberger had misrepresented the value of the venture to

16

induce a sale at an undervalued price. *Id.* at 171–74.  A jury found against Schlumberger, the trial court issued a judgment notwithstanding the verdict, and the appeals court reversed and rendered judgment in accordance with the jury's findings. *Id.* at 175.  The Texas Supreme Court reversed and found that the contract's disclaimer clause barred the common-law and statutory fraud claims as a matter of law.  *Id.*  The court acknowledged prior opinions stating that "a release could be set aside if it was induced by a fraudulent representation or promise—even if the release contained language disclaiming that any such representation had been made.  Other cases hold to the contrary."  *Id.* at 178.

The court stated that "well-established rules of contract interpretation govern whether the [contract] gave the requisite clear and unequivocal expression of intent necessary to disclaim reliance on these specific representations. . . . The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding."  *Id.* at 179.  The court noted that the contract resulted from arm's-length negotiation in which the parties were represented by counsel and that there was no fiduciary or confidential relationship between the parties.  *Id.* at 177.  The court emphasized that the parties had long disputed the project's value and feasibility and intended the contract to resolve that dispute. *Id.* at 179–80.  The court found that the disclaimer—which stated, "none of us is relying upon any statement or representation of any agent of the parties being released hereby.  Each of us is relying on his or her own judgment"—was made with the intent to eliminate fraud claims.  *Id.* at 180.  The court concluded that given these facts, the disclaimer clause precluded the fraud claim:

17

> In sum, we hold that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement. We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. *See Prudential*, 896 S.W.2d at 162 (identifying some circumstances in which "as is" clause would not preclude fraudulent inducement claim). We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance on representations about the feasibility and value of the sea-diamond mining project needed to support the Swansons' claim of fraudulent inducement.

*Id.* at 181.  This general rule also precluded the claim that Schlumberger had fraudulently failed to disclose information that it had a duty to disclose, again by negating the element of reliance.  *Id.* at 180–82.

The Fifth Circuit has applied the *Schlumberger* rule in several cases involving claims of fraudulent inducement.  As one court summarized, "the Fifth Circuit opinions have consistently looked to the structure and terms of contracts in order to determine whether clear and unequivocal intent to disclaim reliance exists under *Schlumberger.* They have implicitly rejected any requirement of emphatic, tailored drafting, or general factual congruity with *Schlumberger.*"  *Steinberg v. Brennan*, No. Civ. A. 3:03-CV-0562, 2005 WL 1837961, at *4 (N.D. Tex. July 29, 2005); *see Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566 (5th Cir. 2003) (the court determined that "the language and intent" of the employment agreement demonstrated that plaintiffs did not rely on representations allegedly made during the negotiations to acquire the plaintiffs' business and hire the plaintiffs; the agreement's generic merger clause did not evince a clear intent to disclaim reliance, but another provision giving

18

the defendants the sole right to determine whether to expand a particular business program refuted the plaintiffs' alleged reliance on a representation that such expansion would take place, and a provision that the defendants made "no representations, warranties, and/or guarantees of the accuracy of the numbers and/or assumptions" refuted the plaintiffs' alleged reliance on certain statistical representations, without regard to whether the merger clause was drafted specifically for that transaction or in response to a prior dispute); *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399 (5th Cir. 2000) (in considering whether a merger clause precluded a fraudulent inducement claim based on an alleged oral agreement to enter into another contract after the written contract at issue, the court explained that under *Schlumberger* "a simple merger clause restricting recovery to that provided by the terms of the contract" would not preclude a fraudulent inducement claim, but language stating that the contract was "in lieu of any and all prior or contemporaneous agreements, conditions or understandings" explicitly contradicted the assertion that the parties relied on promises to enter further contracts, making the merger clause enforceable without regard to the existence of prior disputes or whether the merger clause was extensively negotiated or specifically drafted for that transaction); *Seniguar v. Ford Motor Co.*, 71 Fed. App'x 440 (5th Cir. 2003) (enforcing a disclaimer stating that "no representation of any kind has been made to [the contracting party] with respect to this settlement by Ford Motor Company" to preclude a claim that the other party had misrepresented the settlement value).

District courts applying *Schlumberger* also examine the language and structure of the contracts at issue, in light of the facts surrounding their formation, to determine whether the

contracts evince an "intent to disclaim reliance on past representations."  *See, e.g.*, *NetKnowledge Techs., L.L.C. v. Rapid Transmit Techs.*, Civil Action No. 3:02-CV-2406-M, 2007 WL 518548 (N.D. Tex. Feb. 20, 2007) (enforcing an arbitrator's refusal to enforce a "boilerplate," "buried" merger clause); *Escopeta Oil & Gas Corp. v. Songa Mgmt., Inc.*, Civil Action No. 1:06-CV-386, 2007 WL 171721 (E.D. Tex. Jan. 17, 2007) (finding that a merger clause did not apply when the subject matter of the dispute was not contained in the contract); *Nutrasep, LLC v. TOPC Tex. L.L.C.*, No. A-05-CA-523 LY, 2006 WL 3063432, at *8 (W.D. Tex. Oct. 27, 2006) ("[T]he disclaimers in this case are standard boiler-plate provisions that do not clearly and unequivocally disclaim reliance on the specific representations that form the basis for Defendants' fraud claims. In addition, Defendants assert and have provided the Court with summary judgment evidence that they were not represented by legal counsel during the negotiations and execution of the Agreements at issue in this case."); *Fair Isaac Corp. v. Tex. Mut. Ins. Co.*, No. H-05-3007, 2006 WL 2022894, at *2 (S.D. Tex. July 17, 2006) ("Each party represents and warrants to the other party that in entering into this [Contract] it has not relied upon any representations, promises or assurances from another party . . . not expressly contained in this [Contract]."); *Steinberg*, 2005 WL 1837961, at *6 ("This contract comprehensively sets forth an arm's-length transaction between sophisticated parties who understand the risks involved in stock transfers and have allocated those risks in a deliberate manner.  In particular, it allocates the burdens and associated risks of verifying the financial history and viability of the Company to the purchaser, not the seller. . . . These disclaimers, which specifically address the category of

20

representation now at issue, make clear that [the plaintiff] did not rely on [the defendant's] prior representations."); *Corp. Link, Inc. v. Fairbanks Capital Corp.*, No. Civ. A. 3:03-CV-0506, 2005 WL 770564, at *9 (N.D. Tex. April 4, 2005) ("[T]he merger clause is unambiguous and clearly states that 'all prior discussions and agreements' are superseded. The merger clause was not buried in the middle of a complex and lengthy contract; instead it was part of a fairly simple six-page agreement. Further, there has been no suggestion that the parties were in unequal bargaining positions or that this was a contract of adhesion.").

Texas state courts applying *Schlumberger* have concluded that disclaimer clauses do not bar fraudulent inducement claims when, for example, the parties are not sophisticated or represented by counsel, or the contract is unclear. *See Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 394 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (defendant had allegedly provided false reports about the value of franchises offered for sale under a contract that contained a disclaimer clause; the court found that the clause did not disclaim reliance on representations relating to "an existing dispute at the formation of the agreement" or otherwise clearly express the party's intent to waive fraudulent inducement claims, noting that one party was not represented by counsel and that the agreement may not have been the result of arm's-length negotiations); *John v. Marshall Health Servs., Inc.*, 91 S.W.3d 446, 450 (Tex. App.—Texarkana 2002, pet. denied) (party was not represented by counsel and the contract was at the beginning rather than the end of the parties' relationship); *Woodlands Land Dev. Co., L.P. v. Jenkins*, 48 S.W.3d 415 (Tex. App.—Beaumont 2001, no pet.) (finding that a party was not sophisticated and the contract

was not specific); *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet.

denied) (finding that a party was not represented by counsel and was not sophisticated in

business).

The fact-intensive approach required by the applicable case law is applied to the

structure and terms of the contracts at issue, to determine whether clear and unequivocal

intent to disclaim reliance is present.

### B.      Analysis

It is undisputed that both Whitney Bank and Horridge were sophisticated and had a

long-standing, arm's-length relationship.  The March 2004 Note, Loan Agreement, and

guaranty renewed and extended existing debt, security agreements, and guaranties and added

$1 million in new debt that was also subject to the security agreements and guaranties.  The

question is whether the merger clauses in the loan documents and guaranty clearly evince an

intent to disclaim reliance on past representations.  *Schlumberger*, 959 S.W.2d at 181;

*Steinberg*, 2005 WL 1837961, at *4.

The merger clause in the Commercial Note states:

> THIS NOTE AND ALL OTHER LOAN DOCUMENTS
> EMBODY THE FINAL, ENTIRE AGREEMENT OF MAKER
> AND BANK AND SUPERCEDES ANY AND ALL PRIOR
> COMMITMENTS, AGREEMENTS, REPRESENTATIONS,
> AND UNDERSTANDINGS, WHETHER WRITTEN OR
> ORAL, RELATING TO THE SUBJECT MATTER HEREOF
> AND THEREOF AND MAY NOT BE CONTRADICTED OR
> VARIED BY ANY EVIDENCE OF PRIOR,
> CONTEMPORANEOUS OR A [sic] SUBSEQUENT ORAL
> AGREEMENTS OR DISCUSSION OF MAKER AND BANK.

> THERE ARE NO ORAL AGREEMENTS BETWEEN
> MAKER AND BANK.

(Docket Entry No. 136, Ex. B-1).  The nine-page First Amended and Restated Commercial

Business Loan Agreement has two merger clauses:

> THIS AGREEMENT, THE NOTE, AND THE OTHER LOAN
> DOCUMENTS REFERRED TO HEREIN  EMBODY THE
> FINAL, ENTIRE AGREEMENT AMONG THE PARTIES
> HERETO AND SUPERCEDE ANY AND ALL PRIOR
> COMMITMENTS, AGREEMENTS, REPRESENTATIONS,
> AND UNDERSTANDINGS, WHETHER WRITTEN OR
> ORAL, RELATING TO THE SUBJECT MATTER HEREOF
> AND MAY NOT BE CONTRADICTED OR VARIED BY
> EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR
> SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS
> OF THE PARTIES HERETO.  THERE ARE NO ORAL
> AGREEMENTS BETWEEN THE PARTIES HERETO.
> . . . .
>
> THE LOAN DOCUMENTS REPRESENT THE FINAL
> AGREEMENT BETWEEN THE PARTIES AND MAY NOT
> BE CONTRADICTED BY EVIDENCE OF PRIOR,
> CONTEMPORANEOUS OR SUBSEQUENT ORAL
> AGREEMENTS OF THE PARTIES.

(Docket Entry No. 136, Ex. B-2 at 6, 7).  The seven-page (Restated) Continuing Guaranty

is signed by two guarantors, Horridge and B&C Flight Management.  The guaranty's merger

clause states:

> THIS GUARANTY EMBODIES THE FINAL, ENTIRE
> AGREEMENT OF GUARANTOR AND BANK WITH
> RESPECT TO THE GUARANTOR'S GUARANTY OF THE
> OBLIGATIONS AND SUPERCEDES ANY AND ALL PRIOR
> COMMITMENTS, AGREEMENTS, REPRESENTATIONS,
> AND UNDERSTANDINGS, WHETHER WRITTEN OR
> ORAL, RELATING TO THE SUBJECT MATTER HEREOF.
> THIS GUARANTY IS INTENDED BY THE GUARANTOR

> AND THE BANK AS A FINAL AND COMPLETE
> EXPRESSION OF THE TERMS OF THE GUARANTY, AND
> NO COURSE OF DEALING BETWEEN GUARANTOR AND
> BANK, NO COURSE OF PERFORMANCE, NO TRADE
> PRACTICES, AND NO EVIDENCE OF PRIOR,
> CONTEMPORANEOUS OR SUBSEQUENT ORAL
> AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC
> EVIDENCE OF ANY NATURE SHALL BE USED TO
> CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY
> TERMS OF THIS GUARANTY.  THERE ARE NO ORAL
> AGREEMENTS BETWEEN GUARANTOR AND BANK.

(Docket Entry No. 136, Ex. B-3 at 4).

These merger clauses do not disclaim reliance on any specific representation, but instead state that earlier oral or written statements extrinsic to the agreements, related to their subject matter, are superseded by the agreements and may not contradict, supplement, or modify any contractual term.  (Docket Entry No. 136, Exs. B-1 to B-3).  The merger clauses preclude a fraud claim based on prior representations that are related to the loan agreements and guaranty but that would vary or contradict their terms.

The merger clauses do not preclude a fraud claim based on a representation included in the contracts themselves.  The loan documents and guaranties contain specific representations that form part of the basis of Whitney Bank's fraud claim.  The Ratification of Previously Executed Security Agreements reaffirmed the warranties and representations in each of the Aircraft Security Agreements that were executed in connection with the earlier loans.  (Docket Entry No. 136, Exs. B-5 to B-10).  The Security Agreements specifically state that the collateral will be maintained in conformity with the manufacturer's operating instructions, will be in airworthy condition, will comply with FAA regulations, and will

24

comply with the requirements for airworthiness certificates.  (*Id.*, Exs. B-5 to B-9).  The Security Agreements specifically represented the condition of the planes and their engines, maintenance, and airworthiness.  (*Id.*).   The   loan documents included specific representations as to the financial condition of Air Ambulance, (*id.*, Ex. B-2, ¶ 3), limited Air Ambulance and B&C Flight Management's ability to merge with other companies and sell stock, (*id.*, ¶ 4), limited Air Ambulance and B&C Flight Management's ability to obtain additional loans, (*id.*, ¶¶ 5, 6), and required Air Ambulance and B&C Flight Management to maintain specific cash flow to debt, debt to tangible net worth, and current asset to current liability ratios, (*id.*, ¶ 8).  The loan documents specifically stated that the additional $1 million in loan proceeds were to be used "for the acquisition of Able Air Ambulance." (Docket Entry No. 136, Ex. B-2 at 1).  Whitney Bank has presented summary judgment evidence that when Horridge executed the loan documents on May 7, 2004, he knew of the FAA investigation and knew that the airplanes did not comply with FAA airworthiness certification requirements[5]; he had ceased operations; and he did not intend to use the additional loan to acquire Able Air Ambulance, Inc.[6]

---

[5]  The record contains evidence that when Horridge executed the loan documents, the aircraft securing the loan and providing the basis for the borrower's ability to operate were poorly maintained and documented, (Docket Entry No. 136, Ex. K-10), and that the FAA had warned Horridge about the maintenance and condition of the planes, (*id.*, Exs. K-6, K-7).  The loan documents required the airplanes to be in "good condition" with "all record, logs, and other materials required by the Federal Aviation Administration."  (Docket Entry No. 136, Ex. B-5 at 3; Ex. B-6 at 3; Ex. B-7 at 3; Ex. B-8 at 3; Ex. B-9 at 3).

[6]  In his deposition, when asked about the purpose of the 2004 loan proceeds, Horridge responded, "We were going to purchase a couple books of business to gain some personnel for expanding our company, a new division, into the retail air ambulance business.  And my buyer and I—Schweiner were working to acquire Able Air Ambulance and another company that was owned by Richard Back that had a small

Horridge argues that some of the representations that Whitney Bank alleges as part of its fraud claim are barred by the merger clauses.  These representations are that Horridge had not previously filed for bankruptcy; that he overstated his personal assets; and that he did not disclose a prior bank fraud conviction.  The guaranty signed by Horridge as an individual and as president of B&C stated that "Guarantor will furnish to Bank, as soon as available, and in any event within forty-five (45) days after the end of each fiscal year of such Guarantor, beginning with the fiscal year ending 2004, a copy of the financial statements of such Guarantor for such fiscal year and a certificate of such Guarantor to Bank disclosing and certifying as to all material changes in such Guarantor's debt or net worth or otherwise certifying that there has been no material change in such guarantor's personal debt or net worth since the previous financial statement was delivered to Bank."  (Docket Entry No. 136, Ex. B-3, ¶ 4(a)).  The record does not show whether Horridge provided such a statement of personal debt or net worth.  The record also does not show whether Horridge's alleged prior bankruptcy and bank fraud conviction would be included in this statement, if provided.  The record does not show whether, as part of the loan documents, Whitney Bank sought or received specific assurances from Horridge as to his financial condition or history.

---

operation in Baltimore and Atlanta.  And—then I was also trying to acquire Global Air Transport that's operating out of Cal—out of Colorado.  And I needed, I thought, maybe 2- or $300,000 to—and then give them stock in the public company to acquire the company and then I would need money to carry the accounts receivable, because that's the difference between retail and wholesale."  (Docket Entry No. 113, Ex. B at 206–07).  When asked if it was correct that he asked Whitney Bank to loan Air Ambulance $1 million to acquire Able Air Ambulance, Inc., Horridge stated that was "incorrect," and stated that he told "the little Raney guy," that "I thought we'd pay no more than 100-$200,000 for the acquisitions and we needed the money for accounts receivable."  (*Id*. at 208).

The merger clauses state that the loan documents represent the parties' entire agreement and that prior oral or written representations cannot vary or contradict the parties' contractual agreements.  The merger clauses do not express an intent to waive fraudulent inducement claims or otherwise disclaim reliance on representations identified in the loan documents.  The merger clauses do not preclude a fraud claim based on written representations set out in the loan contracts or on a failure to disclose information relating to representations made in those contracts, assuming a duty to disclose is present.  The merger clauses would, however, preclude a fraud claim based on prior oral or written representations related to but extrinsic to the loan agreements, which varied or contradicted those agreements.  *See, e.g*, *Formosa Plastics*, 960 S.W.2d at 41 (the plaintiff relied on representations made in a bid package later included in contract; the Texas Supreme Court concluded that there is an independent "duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations").

Horridge's only basis for moving for summary judgment as to Whitney Bank's fraud claim is the merger clauses.  The record shows that at least some of the representations Whitney Bank alleges as the basis of the fraud claim are in the loan contracts themselves and would not be precluded by the merger clauses.  The present record is insufficient to show that the merger clauses preclude a claim of fraud based on the specific representations Whitney Bank alleges.  Horridge's motion for partial summary judgment as to Whitney Bank's fraud claim is denied.

IV.   **Whitney Bank's Summary Judgment Motion as to Horridge's Tortious Interference Counterclaim**

A.   **The Applicable Case Law**

Under Texas law, the elements of a tortious interference with contract claim are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) such act was a proximate cause of damage; and (4) actual damage or loss occurred. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004) (applying Texas law).  The elements of a claim for tortious interference with a prospective contract are that:  (1) there was a reasonable probability that the parties would enter into the contract; (2) the tortfeasor intentionally prevented the contract from occurring; and (3) the tortfeasor did so with the purpose of harming the plaintiff. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 729 (Tex. 2001).

B.   **The Record Evidence**

Horridge counterclaimed for tortious interference with a contract or prospective contract with Jerry Schweiner, under which Three Palms Growth L.L.C. would purchase Horridge's shares in Air Ambulance.  (Docket Entry No. 91, ¶¶ 39–47).  Schweiner specializes in buying companies in bankruptcy, calling himself a "turn around specialist." (Docket Entry No. 136, Ex. H at 8).  Horridge alleges that in early May 2004, he, as sole shareholder of Air Ambulance, had reached an agreement under which Schweiner would pay cash for most of Horridge's interest in the company.  Horridge alleges that even after the FAA's May 20, 2004 order suspending the airworthiness certificates for the Lear Jets and the

June 2, 2004 order revoking the air carrier certification for B&C Flight Management,

"Schweiner still wished to go forward with the transaction, albeit on terms slightly less

favorable." (Docket Entry No. 91, ¶¶ 39–41).  Horridge alleges tortious interference in that

"the injunction obtained by Whitney Bank" prevented him from transferring his shares in Air

Ambulance to Three Palms; that Whitney Bank demanded that Horridge transfer his shares

to Air Ambulance's CPA, Dan Forgy, for no consideration, before the planes would be

released, which also prevented Horridge from closing the transaction with Three Palms; and

that Whitney Bank wrongfully seized planes that were not pledged under the loans "during

a period when the use of the planes could have made the difference between the survival of

Air Ambulance as a viable commercial entity and the fate that it ultimately suffered." (*Id.*,

¶¶ 44–46).  Whitney Bank has moved for summary judgment as to the tortious interference

claim. (Docket Entry No. 136).  In response to Whitney Bank's motion, Horridge adds the

argument that Whitney Bank fraudulently induced his agreement to the injunctions entered

by this court. (Docket Entry No. 154 at 5–7).

The record shows that on May 7, 2004, Schweiner submitted a proposal to Horridge

to buy eighty percent of Horridge's interest in Air Ambulance, assume Air Ambulance's

debts, and provide capital. (Docket Entry No. 136, Ex. K-4).  The proposal called for a June

30, 2004 closing date. Schweiner modified that proposal on May 22, 2004 and again on May

26, 2004. (Docket Entry No. 136, Exs. K-7, K-8).  On May 20, 2004, the FAA suspended

the airworthiness certificates for Air Ambulance's airplanes and on June 2, 2004, revoked

B&C Flight Management's certificate to operate as an on-demand carrier. (*Id.*, Exs. K-9 to

K-10).  On June 9, 2004, this court entered a temporary restraining order sequestering the planes.  (Docket Entry No. 4).  Schweiner continued to negotiate with B&C Flight Management after the sequestration order issued.  In a June 22, 2004 communication, which incorrectly stated that Forgy had recently become the sole shareholder of Air Ambulance, Schweiner did not mention the sequestration.  (Docket Entry No. 136, Ex. K-15).  On June 23, 2004, Schweiner sent emails asking about some aspects of Air Ambulance.  (*Id.*, Exs. K-17, K-18).  On June 24, 2004, this court entered an agreed injunction delivering possession of the aircraft securing the loans to Whitney Bank.  (Docket Entry No. 15).  On June 28, 2004, Schweiner submitted another revised offer, this time to Forgy, that took into consideration that the planes did not have airworthiness certificates, assumed that $6.5 million of "bank debt" would need to be immediately paid, and assumed that Forgy was the sole shareholder.  (Docket Entry No. 136, Ex. K-20) ("We would now need to pay off the current $6.5 million of bank debt, rather than assume it.").  On June 28, 2004, Horridge executed a proxy that allowed Forgy to exercise all of Horridge's rights for $10.00 consideration until the proxy was revoked.  (*Id.*, Ex. K-19).  That proxy was never revoked.  (Docket Entry No. 136, Ex. D at 201–02).  Two days later, in a June 30, 2004 email to Air Ambulance's representatives, Schweiner told Air Ambulance that he was not willing to proceed.  He wrote:

> I was not ready to accept any more representation without digging into the details and finding out what is accurate and what is not.  For instance on the MSP program for the jet engines we need to know if the plan was paid in full.  A comment made to me is that only 20% of the payment was

> made.  If [sic] that is true that would be an extra unexpected expense that both the bank and I should know prior to making an offer.  Depending on this amount it also could mean that the P&L state could be off.  Plus all these maintenance costs that are now on the horizon should all of these costs be included in the P&L to give us a true EBITDA.  This all affects the offer to be made.  Sixty days ago we were presented a glowing business with revenues ramping up to $14 million and EBITDA hitting $4 million.  This presents a lot of questions that require in depth due diligence and [to] be honest with myself and you I was somewhat HOOD WINKED.
>
> In addition, I was told by TEX that B&C Flight Management was sold to Dan Forgy on June 14 or 15, 2004.  If that is the case why is there such a hurry to get a down payment and offer without knowing the specific details on cost, personnel, and what business is left.  It appears with this accelerated urgency that there may be some unknowns or do I get HOOD WINKED again.

(Docket Entry No. 136, Ex. K-21).  Schweiner believed that Horridge and an Air Ambulance employee, Tex Garner, had misled him.  (*Id*., Ex. H at 125–26).

On July 5, 2004, Schweiner wrote a letter terminating his business relationship with Air Ambulance.  (*Id*., Ex. K-23).  Schweiner stated in the letter that he had investigated what steps would be needed to regain the planes' airworthiness certificates and pay the loan indebtedness in order to get the planes released from the bank.  Schweiner expressed doubts about the planes and whether they were "underwater as to market value."  (*Id*. at 1).  Schweiner was also "surprised" that when they met to negotiate the deal, Horridge demanded a nonrefundable $500,000 down payment.  (*Id*.).  Schweiner ended the letter, as follows:

> On June 3, 2004 I brought the asset and stock sales agreement with me and I was totally surprised that [Horridge] was ready to sign on the spot, without an attorney reviewing them.  Then

> [Garner and Horridge] requested a $500,000.00 deposit.  I then
> determined that there was something in the wind.  You said I
> needed to put a deposit down that was nonrefundable and it is
> clear now that I would have lost it.  These are some of the facts
> and other issues I sure [sic] will be forthcoming.

*Id.* at 2.  Schweiner stated that he would return the due diligence materials.  *Id.*  Horridge

testified that he transferred his Air Ambulance stock to Forgy on August 19 or 20, 2004.

(Docket Entry No. 136, Ex. C at 92–93).

## C.   Analysis

### 1.   *The Existence of a Contract*

Horridge argues that the proposals submitted by Schweiner were binding and

enforceable contracts.  (Docket Entry No. 154 at 7–8).  The record does not support this

argument.  Under Texas law, "[a] contract is legally binding only if its terms are sufficiently

definite to enable a court to understand the parties' obligations.  An agreement to make a

contract at a future time is enforceable if it is specific as to all essential terms.  By contrast,

where an agreement leaves essential terms open for future negotiations, it is not a binding

contract but, rather, an unenforceable 'agreement to agree.'"  *Liberto v. D.F. Stauffer Biscuit

Co., Inc.*, 441 F.3d 318, 323 (5th Cir. 2006) (citations omitted).

Schweiner testified in his deposition that by signing the proposal, the parties agreed

that they "would be the exclusive parties working on the deal" and would negotiate a

contract.  (Docket Entry No. 154, Ex. 4 at 131–33).  The record shows that Schweiner made

a series of proposals to Horridge and his companies.  Horridge signed two.  (Docket Entry

No. 136, Exs. K-7, K-8).  Horridge signed the first proposal, dated May 22, 2004, on May

24, 2004. The parties did not close on the proposed date of June 30, 2004. (Docket Entry

No. 136, Ex. K-7). The second proposal, dated May 26, 2004, was signed by Horridge on

May 28, 2004. That proposal has a closing date of June 15, 2004 and contemplates four

separate contracts to be negotiated and drafted. (*Id*., Ex. K-8). In his deposition, Horridge

agreed that none of the contracts proposed ever materialized:

> Q:    [Your valuation of your Ambulance stock] relates to
>       various Schweiner proposals that went back and forth
>       and that we discussed earlier on; is that correct?
>
> A:    Yes.
>
> Q:    And those are the proposals that never materialized and
>       were never reflected in a definitive agreement, correct?
>
> A:    Yes.

(Docket Entry No. 136, Ex. D at 225). The proposals are unenforceable "agreements to

agree," not existing contracts. *Liberto*, 441 F.3d at 323.

> 2.    *The Claim that Whitney Bank Committed Tortious Interference by
>       Obtaining the Agreed Injunctions through Fraud and Economic Duress*

Horridge alleges that Whitney Bank tortiously interfered with the prospective

Schweiner contract to purchase Horridge's shares in Air Ambulance by obtaining the agreed

injunctions that prohibited Horridge from transferring the assets of Air Ambulance and by

seizing the aircraft that served as collateral for the loans. (Docket Entry No. 91 at 5).

Horridge claims that the agreed injunctions this court entered were fraudulently induced or,

in the alternative, unenforceable because Horridge was under economic duress. (Docket

Entry No. 154 at 5–7).

33

In his affidavit, Horridge stated as follows:

> I only agreed to the first and second injunctions entered in this matter for two reasons: (1) the unconscionable demands made by Whitney National Bank ("Whitney") that without my acquiescence would have resulted in destruction of my property, Air Ambulance by B&C Flight Management, Inc. ("Air Ambulance"), and (2) the fraudulent promises made by representatives of Whitney that they would assist in returning Air Ambulance to economic vitality if I would agree.
>
> I was under tremendous time constraints during this period and Whitney took unjust advantage of my economic distress by requiring me to agree to injunctions or face the imminent dissolution of the company that I had worked so hard to create and nurture. Whitney's threat and the economic distress that I feared were of such a nature that my will to act otherwise was destroyed and I took a course of action, agreeing to the injunctions, that I would not otherwise have taken.
>
> . . . .
>
> Furthermore, Whitney represented that it would assist me and take such steps as necessary to return Air Ambulance to economic viability. However, Whitney failed to perform these promises and Air Ambulance is being dissolved.

(Docket Entry No. 154, Ex. 1, ¶¶ 2, 3, 5).  In his counterclaim, Horridge alleges that "Whitney Bank led Mr. Horridge to believe that it would release the Airplanes and take such steps as commercially reasonable to return Air Ambulance to economic viability if Mr. Horridge would transfer his shares to Dan Forgy for no consideration." (Docket Entry No. 91, ¶ 48).

         *a.*     *The Claim of Fraudulent Inducement to the Agreed Injunctions*

In his deposition, Horridge testified that two letters evidence the fraudulent misrepresentations Whitney Bank allegedly made to induce Horridge to agree to the injunctions:  a July 2, 2004 letter from Drew Coates, Air Ambulance's attorney, to Steve Schueler, Whitney Bank's attorney, and a July 22, 2004 letter from Scheduler to Joe Redden, another Air Ambulance attorney.  (Docket Entry No. 136, Ex. D at 222–24).  These letters are in the summary judgment record.  (Docket Entry No. 136, Exs. B-12, B-14).

In the July 2, 2004 letter, Air Ambulance's attorney submitted a proposal prepared by Forgy to Whitney Bank.[7]  The proposal asked Whitney Bank to abate the loan payments until November 1, 2004, to provide $500,000 in working capital, to provide funds to repair the aircraft and add those funds to the outstanding loans, and to allow Air Ambulance to perform the necessary maintenance to bring the aircraft into compliance with FAA airworthiness certification requirements.  (Docket Entry No. 136, Ex. B-12).  In the July 2 letter, Forgy stated, "Mr. Horridge is not going to be permitted by the FAA to work out this problem in an active manner.  He is willing to give up ownership of the Company in exchange for my efforts in bringing the Company back to an operational point and resolving his personal bank guaranty exposure.  As you probably know from your files, Mr. Horridge and I approached the bank in November of 2003 with a proposal where I would acquire 50% of the Company as part of a succession plan. We were attempting to put a plan together to allow him to

---

[7]  Horridge testified in his deposition that he had no knowledge of this letter and did not see it until he was reviewing documents a few weeks before his July 13, 2006 deposition.  In the same deposition, Horridge testified that this letter contained fraudulent promises that induced him to agree to the injunctions and stock transfer, (Docket Entry No. 136, Ex. D at 202–05, 223).

gradually phase out his activity for retirement and health reasons." (*Id.* at 2).  Forgy also states, "[w]e were working with a potential buyer to take over the financial responsibility of the Company.  We have not been successful in getting a commitment from the potential buyer and have ceased negotiations with him." (*Id.*).  There is no evidence in the record that Whitney agreed to Forgy's proposal.

On July 13, 2004, this court entered a temporary restraining order preventing Horridge and his companies from transferring assets.  (Docket Entry No. 27).  On July 21, 2004, counsel for Horridge and for Whitney Bank met to discuss the terms of a proposed agreed preliminary injunction.  (Docket Entry No. 136, Ex. B-13).  In a July 22, 2004 letter from Whitney Bank's counsel to Horridge's counsel sent after this meeting, Whitney Bank attached a "Term Sheet" for a proposed agreed preliminary injunction.  (*Id.*, Ex. B-14 at 1). Three of the eight proposed terms form the basis of Horridge's claim that he was fraudulently induced to agree to the injunction.  Those three terms are as follows:

> 2.  Dan Forgy and Roy Horridge to provide a written representation that Horridge's stock will be transferred to Forgy for no consideration, direct or indirect, and that Roy Horridge will receive no payment or transfer of assets from either Dan Forgy or any of the companies, with the understanding that Horridge may be retained for future consulting services on an hourly basis.
>
> . . . .
>
> 5.  Defendants will work to secure agreement with the FAA regarding hours and cycles required to reinstate airworthiness certificates, with copies of written communications between defendants and FAA provided to Whitney.

36

      6.     Whitney will provide defendants access to log books and
maintenance records as required to facilitate defendants'
efforts to secure reinstatement of planes with FAA.

(*Id.* at 2).[8]  The defendants agreed to the injunction through their counsel on July 22, 2004.

(*Id.*, Ex. B-15).  This court entered the injunction on July 22, 2004.  (Docket Entry No. 41).

On August 19 or 20, 2004, Horridge transferred his stock to Forgy.  (Docket Entry

No. 136, Ex. C at 92–93).  At that time, another company owned some of the stock.  (*Id.* at

92).  Forgy testified in his deposition that after Horridge agreed with the FAA that he would

no longer be involved in the company, "it seemed at the time, I think to both of us, that the

most logical person that could perhaps reorganize the company and bring it forward would

be me.  And his benefit would be if we were successful, then Whitney Bank and Bank One

would get paid back on their loans."  (Docket Entry No. 136, Ex. G at 50–51).  Forgy

testified that the stock transfer was his idea and that Horridge agreed to it.  (*Id.* at 51).

Horridge testified that Whitney Bank was the source of the idea to transfer the stock

to Forgy.  Whether Forgy and Horridge originated the idea or whether Whitney Bank

originated the idea and Forgy and Horridge agreed is not a material dispute.  In his

deposition, Horridge testified as follows:

      Q:     Is it your testimony that Whitney Bank insisted that you
transfer the stock to Mr. Forgy?

---

[8]  The five other terms are that the defendants, then Air Ambulance, B&C Flight Management, and
Horridge, would provide Horridge and his companies' financial information, Whitney would forego attaching
the planes owed to Bank One as the defendants substantiated the Bank One loans, Whitney would obtain liens
and not attachments on vehicles, the injunction would allow living expenses and attorney's fees, and the
agreement did not waive other rights.

> A:   They put it in writing.  The term sheet kind of speaks for itself, doesn't it?
>
> Q:   That's not really an answer to my question.  Is it your testimony that Whitney Bank demanded that you transfer your stock in Air Ambulance By B & C Flight Mgmt. to Mr. Forgy?
>
> A:   I'm not saying they demanded it, but I thought they wanted that.

(Docket Entry No. 136, Ex. C at 90).[9]

The letters that Horridge claims reflect Whitney Bank's fraudulent representations made to induce him to agree to the injunctions do not state that Whitney Bank would "take such steps as necessary to return Air Ambulance to economic viability," as Horridge alleges.  Nor do the letters state that Whitney Bank would "release the Airplanes" or perform any of the steps proposed by Forgy.  The letters do not make any "threat" to destroy Horridge's property.  Nothing in the record raises a fact issue as to whether Whitney Bank made misrepresentations as Horridge alleged, to induce his agreement to the injunctions or his transfer of his Air Ambulance stock to Forgy.[10]

---

[9]  In his deposition, Horridge testified that the Term Sheet was made in August 2004.  (Docket Entry No. 136, Ex. C at 90).  However, the record shows that the Term Sheet was sent to Horridge's attorney on July 22, 2004.  (*Id.*, Ex. B-14).

[10]  Further, the record does not show that the injunctions were the reason that Schweiner stopped negotiations with Horridge and Air Ambulance.  Instead, Schweiner stated that he had fundamental questions about the amount of the bank debt, the honesty of the Air Ambulance principals, and the problems with the FAA.  Schweiner refers to the bank's possession of the planes only in conjunction with the large amounts of bank debt Air Ambulance owed.  The record also shows that after the injunctions were obtained, Schweiner was negotiating with Forgy, and not Horridge.  The record does not show that Whitney had a role in leading Schweiner to believe that Forgy was the owner of the companies.

Horridge claims that he agreed to the injunctions for two reasons.  First, Whitney made "unconscionable demands . . . that without my acquiescence would have resulted in the destruction of my property, Air Ambulance."  (*Id*., ¶ 2).  Horridge does not identify these "unconscionable demands" in the allegations or in the summary judgment evidence.  To the contrary, Horridge testified that Whitney Bank did not demand that he transfer the stock to Forgy.  Nothing in the summary judgment record shows that  Whitney Bank made demands that it lacked a legal right to make under the loan agreements.

Horridge's second justification is "fraudulent promises made by representatives of Whitney that they would assist in returning Air Ambulance to economic vitality if I would agree." (*Id*.).  Other than the alleged statements made in the injunction term sheet, Horridge has not identified representations made by Whitney Bank that induced him to agree to the injunctions.  There is no evidence in the record that "Whitney Bank led Mr. Horridge to believe that it would release the Airplanes and take such steps as commercially reasonable to return Air Ambulance to economic viability if Mr. Horridge would transfer his shares to Dan Forgy for no consideration."  (Docket Entry No. 91 at 6).

Whitney Bank's summary judgment motion as to Horridge's counterclaim for fraudulent inducement is granted.

        *b.*      *The Claim that Horridge Agreed to the Injunctions under Economic Duress*

Horridge claims that the agreed injunctions this court entered were invalid or unenforceable because Horridge's agreement was obtained while he was under economic

duress. (Docket Entry No. 154 at 5–7). Under Texas law, a contract induced by economic duress may be invalid if a party takes advantage of that duress to coerce a party into agreeing. *Brown v. Cain Chem., Inc.*, 837 S.W.2d 239, 244 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Economic duress requires that: "(1) there is a threat to do an act that the threatening party has no legal right to do; (2) the threat is of such a character as to destroy the free agency of the person to whom it is directed, causing him to do what he was not legally bound to do and would not otherwise do; (3) the restraint caused by the threat is imminent; and (4) the party against whom it is directed has no present means of protection." *Sudan v. Sudan*, 145 S.W.3d 280 (Tex. App.—Houston [14th Dist.] 2004), *rev'd*, 199 S.W.3d 291 (Tex. 2006); *see also In re RLS Legal Solutions, Inc.*, 156 S.W.3d 160, 163 (Tex. App.—Beaumont 2005, no pet.). "The test for causation, *i.e.*, whether the duress contributes substantially to the claimant's decision to assent, is subjective, considering all surrounding circumstances, such as the background and relationship of the parties and the emotional condition of the party claiming duress." *Sudan*, 145 S.W.3d at 287 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 175 cmt. c). The economic duress must be "the result of threats which render persons incapable of exercising their free agency and which destroy the power to withhold consent," and "[t]he compulsion must be actual and imminent, and not merely feigned or imagined." *Id.* at 292.

In *Sudan*, a woman's ex-husband allegedly threatened to stop honoring their previous alimony agreement. *Sudan*, 145 S.W.3d at 288. She agreed to an amendment to the alimony agreement that she later challenged as induced by economic duress. *Id.* The court of appeals

40

reversed a grant of summary judgment against the plaintiff on the basis of evidence that she had no readily available remedy for the breach of the alimony agreement. *Id.* The Texas Supreme Court reversed, finding that the plaintiff's duress was not imminent because she "had adequate time to consult with professionals and apparently chose to negotiate an amendment rather than enforce the parties' existing agreement." *Sudan v. Sudan*, 199 S.W.3d 291, 292–93 (Tex. 2006). The alleged duress had not "deprived her of a present means of protection or caused her imminent restraint." *Id.* at 293.

Horridge stated in his affidavit that Air Ambulance was losing $500,000 a month, which he characterizes as "economic duress." (Docket Entry No. 154, Ex. 1, ¶¶ 3, 4). The record shows that Horridge was represented by counsel in all of the agreed orders entered by this court. Horridge's counsel negotiated the temporary restraining order over two days with Whitney Bank's counsel. (Docket Entry No. 136, Exs. B-13, B-14). The record does not show that Horridge was unable to negotiate the agreed orders. Despite his alleged economic duress, Horridge took full advantage of the opportunity to have his counsel negotiate and review and the terms of the injunctions before they were entered on June 24, 2004 and July 22, 2004. Horridge has not identified facts that raise a disputed issue material to determining whether he was under economic duress that could make the agreed injunctions invalid or unenforceable. *Sudan*, 199 S.W.3d at 292–93.

Summary judgment is granted as to Horridge's counterclaim that Whitney Bank tortiously interfered with the Schweiner contracts by obtaining injunctions entered by this court.

3.      *The Claim that Whitney Bank Tortiously Interfered by Sequestering Aircraft that were not Collateral for the Loan*

Horridge alleges that Whitney Bank seized several airplanes that secured Bank One debt, not Whitney Bank debt.  (Docket Entry No. 91, ¶ 46).  On June 7, 2004, this court entered a temporary restraining order and on June 9, 2004, issued a writ of sequestration.  (Docket Entry Nos. 3, 4).  The U.S. Marshals sequestered the planes stored in Houston on June 15, 2004.  (Docket Entry No. 136, Ex. B-19).  The Marshals sequestered six Lear Jets and twelve engines; one engine was stored elsewhere.  (*Id*.).  All these planes were collateral for the Whitney Bank debt.  Two Cessnas that were also part of the collateral securing the Whitney Bank loan were stored in Arizona.  (Docket Entry No. 136, Ex. K-1).  The record does not show when the planes in Arizona or the additional engine were seized.

Horridge alleges that Whitney Bank also seized two Lear Jets that were collateral for a Bank One loan.  (Docket Entry No. 136, Ex. D at 176–77).  Horridge alleges that Whitney Bank "wanted us to prove that we had a loan on the airplanes with Bank One."  (*Id*. at 177).  Horridge claims that his counsel immediately called Whitney Bank to point out the problem, but the planes were not released for "several weeks."  (*Id*. at 178–79).  Horridge alleges that he could have performed maintenance on the Bank One planes and operated them using the services of a third party, Joe Pagan, had Whitney Bank not refused to return them.  (*Id*. at 179–83).  Horridge alleges that because Whitney Bank sequestered the Bank One planes, he was unable to complete his contract with Schweiner.  (Docket Entry No. 154 at 8, Ex. 1, ¶ 10).

Horridge did not bring this issue to this court when the planes were seized, in the form of a request for relief from the sequestration order or other request for the return of planes that were not collateral for the Whitney Bank loan. The summary judgment record does not raise a fact issue as to whether the allegedly wrongful seizure of planes that secured the Bank One debt rather than the Whitney Bank debt resulted in the termination of Horridge's negotiations with Schweiner. The airplanes that served as security for the Whitney Bank loan were sequestered in Houston by U.S. Deputy Marshals on June 15, 2004. (Docket Entry No. 136, Ex. B-19). Under the agreed injunction, Whitney Bank was given possession of the secured aircraft on June 24, 2004. (Docket Entry No. 15). Horridge does not allege when the aircraft securing the Bank One loan were seized, where they were seized, or their serial numbers. Even assuming that there were additional aircraft seized that secured a different loan, the record shows that negotiations with Schweiner effectively ended on June 30, 2004 and formally terminated on July 5, 2004. On June 22, 2004, Whitney was given permission to possess the collateral. Schweiner's communications with Air Ambulance after that date do not show that he had knowledge of Whitney Bank's seizure of the aircraft securing the Bank One loan as well as the aircraft securing the Whitney Bank loan.

Schweiner identified a number of reasons as the basis for ending his negotiations with Air Ambulance and Horridge. Given the timing of Schweiner's decision and the stated basis for it, there is no indication in the record that had Air Ambulance—which could not operate any aircraft—had some aircraft available, that would have made any difference in Schweiner's negotiations. Horridge has not raised a fact issue as to whether the seizure of

43

aircraft that secured the Bank One loan could support a claim of tortious interference with his contract or potential contract with Schweiner.

The record also does not support Horridge's allegation that Horridge's stock transfer to Forgy interfered with Horridge's negotiations with Schweiner.  Horridge testified that Whitney Bank did not demand that he transfer the stock.  Moreover, Horridge did not transfer the stock until August 19 or 20, 2004, after Schweiner terminated his relationship with Air Ambulance on July 5, 2004.  The record also shows that Schweiner terminated the negotiations before the July 22, 2004 Whitney Bank communication that Horridge claims encouraged him to transfer the stock.

The record evidence does not raise a fact issue material to determining whether Whitney Bank tortiously interfered with Horridge's prospective or existing contractual relationship with Schweiner.  Whitney Bank's summary judgment motion as to Horridge's tortious interference counterclaim is granted.

## V.    Whitney Bank's Summary Judgment Motion as to Horridge's Fraud Counterclaim

In his fraud counterclaim, Horridge alleges that "Whitney Bank led Mr. Horridge to believe that it would release the Airplanes and take such steps as commercially reasonable to return Air Ambulance to economic viability if Mr. Horridge would transfer his shares to Dan Forgy for no consideration."  (Docket Entry No. 91, ¶ 48).  As a result, Horridge transferred the shares, but Whitney Bank "did not release the airplanes or otherwise assist in returning Air Ambulance to financial health." (*Id.*, ¶ 49).  Horridge alleges that the shares

he transferred were "worth many millions of dollars pursuant to the terms negotiated for the Three Palms transaction." (*Id*.).

As noted, the elements of a fraud claim under Texas law are "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp.*, 960 S.W.2d at 47.  As analyzed above, Horridge testified that the evidence of fraud was in the July 2, 2004 letter from Air Ambulance's attorney to Whitney Bank's attorney, and a July 22, 2004 letter from Whitney Bank's attorney.  (Docket Entry No. 136, Exs. B-12, B-14).  As analyzed above, neither the letters nor other record evidence raises a fact issue as to whether Whitney Bank misrepresented to Horridge that it would release the airplanes and take other steps to help Air Ambulance return to "economic viability" if Horridge transferred his stock to Forgy.  The record contains Forgy's testimony that it was his idea to have Horridge transfer the Air Ambulance stock to Forgy after the FAA told Horridge that he could not continue to be involved in Air Ambulance.  (Docket Entry No. 136, Ex. G at 50–51).  Forgy testified that Horridge agreed to Forgy's stock transfer idea.  (*Id*. at 51).  Horridge testified that Whitney Bank did not "demand" the transfer, but he thought they wanted that."  (Docket Entry No. 136, Ex. C at 90).  In short, the record does not raise a fact issue as to whether Whitney Bank misrepresented that they would release the airplanes and work to restore Air Ambulance to "economic viability" if Horridge transferred his shares to Forgy without consideration, as

Horridge alleged.  Whitney Bank's motion for summary judgment as to Horridge's fraud counterclaim is granted.

## VI.   Damages

For both his fraud claim and his tortious interference claim, Horridge asked this court for "actual, consequential, and exemplary damages as allowed by law, including an award for his significant mental anguish." (Docket Entry No. 91, ¶ 47, 50).  The First Amended and Restated Commercial Business Loan Agreement precludes a claim for "special, indirect, or consequential damages" and for punitive damages.

> Neither the Bank nor any affiliate, officer, director, employee, attorney, or agent of the Bank shall have any liability with respect to, and the Borrower hereby waives, release, and agrees not to sue any of them upon, any claim for any special, indirect, or consequential damages suffered or incurred by the Borrower in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents.  The Borrower hereby waives, releases, and agrees not to sue the Bank or any of the Bank's affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.

(Docket Entry No. 136, Ex. B-2 at 5–6).  Summary judgment is also granted as to the counterclaim for these damages.

## VII.   Conclusion

Horridge's summary judgment motion on Whitney Bank's fraud claim is denied. (Docket Entry No. 134).  Whitney Bank's summary judgment motion as to Horridge's fraud

46

and tortious interference counterclaims is granted.  (Docket Entry No. 136).  In a separate memorandum and opinion, this court will address Whitney Bank's motion for partial summary judgment as to Horridge's liability for the deficiency and his claim that the sale of the aircraft was not commercially reasonable and the related motion to exclude expert testimony on commercial reasonableness.

　　　　　SIGNED on April 30, 2007, at Houston, Texas.

　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　Lee H. Rosenthal
　　　　　　　　　　　　　　　United States District Judge