### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-04-2220 |
| | § | |
| AIR AMBULANCE BY B&C FLIGHT | § | |
| MANAGEMENT, INC.; B&C FLIGHT | § | |
| MGMT, INC.; AND ROY G.  HORRIDGE, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

This memorandum and opinion addresses Whitney Bank's motion for partial summary judgment for the deficiency remaining on the unpaid loan.  (Docket Entry No. 136).  Horridge has raised the affirmative defense that Whitney Bank's disposition of the aircraft securing the loans was not commercially reasonable.  (Docket Entry No. 136).  Horridge has responded to the motion for partial summary judgment.  (Docket Entry No. 154).  In a related motion, Whitney Bank seeks to exclude the testimony of expert witnesses Horridge designated on the issue of whether the sale of the aircraft was commercially reasonable.  (Docket Entry No.  139).  Horridge has responded, asserting that the record raises disputed fact issues material to determining whether the collateral was sold in a commercially reasonable manner.  (Docket Entry No. 153).

Based on careful consideration of the pleadings, the motions and responses, the parties' submissions, and the applicable law, this court grants Whitney Bank's motion for

partial summary judgment as to the deficiency claim and the motion to exclude Horridge's expert witnesses. (Docket Entry Nos. 136, 139). The reasons for the rulings are explained below.

## I.     Background

Most of the pertinent facts were set out in the earlier memorandum and opinion and are not repeated here except to put the motions relating to the deficiency and the commercial reasonableness of the sale into context. Briefly, Whitney Bank made several loans to Air Ambulance, secured by aircraft owned by B&C Flight Management as well as by Horridge's personal guaranty. (Docket Entry No. B-5 to B-10). The aircraft subject to the Security Agreements were two Cessnas and six Lear Jets. (Docket Entry No. 136, Ex. C at 107–09; Ex. K-1).[1] As of April 2004, Air Ambulance's outstanding indebtedness to Whitney Bank exceeded $4.5 million. Air Ambulance also had outstanding loans with Bank One secured by other aircraft. (*Id.*, Ex. C at107-108; Ex. K-1).

The FAA requires that each airplane have an FAA-issued airworthiness certificate. An aircraft owner is required to keep accurate records of the hours the aircraft flies ("times" or "hours") and, for Lear Jets, when they take off and raise the landing gear and land and lower the landing gear ("cycles"). For Lear Jets, a record of "cycles" must be kept for the aircraft and the engines. This information in turn determines what inspections and

---

[1]The Cessnas had registration numbers N 5EU and N 42ML; the Lear Jets had registration numbers N 860MX, N 140 GC, N 251DS, N 988AS, N 535TA, and N 9108Z. (Docket Entry No. 136, Ex. B-4 to B-9, Ex. K-1).

maintenance are required, as well as the length of service of certain parts.  (Docket Entry No. 136, Ex. C at 120-121; Docket Entry No.136, Ex. D at 83–84, 123-124).

In April 2004, Horridge asked Whitney Bank to loan Air Ambulance an additional $1 million and to refinance the existing loans.  Horridge did not tell Whitney Bank about the FAA investigation.  (Docket Entry No. 136, Ex. C. at 213-14).  On May 3, 2004, the FAA sent Horridge a letter identifying "serious deficiencies" in the maintenance of the Lear Jets and demanding that the aircraft be reexamined to evaluate their airworthiness.  (*Id.*, Ex. K-3).  On May 7, 2004, Whitney Bank made an additional $1 million loan to Air Ambulance and renewed and extended the existing debt, secured in part by six Lear Jets and two Cessna.  (Docket Entry No. 136, Exs. B-1 to B-9; *Id*., Ex. K-1).[2]  The Commercial Note was in the amount of $5,685,597.00.  The warranties and representations in each of the earlier aircraft Security Agreements were reaffirmed in the Ratification of Previously Executed Security Agreements.  (Docket Entry No. 136, Ex. B-4).  The Security Agreements specifically stated that B&C Flight Management would keep the aircraft in "such condition as may be necessary to enable the airworthiness certification of the Collateral  to be maintained in good standing at all times."  (*Id*., Exs. B-5 to B-9).  The Security Agreements specifically represented the condition of the planes and their engines, maintenance, and airworthiness.  (*Id*.).  The

---

[2]  The first Security Agreement covered the two Cessnas, N 5EU and N 42ML, and one Lear Jet, N 860MX.  (Docket Entry No. 136, Ex. B-5 at 1).  The second agreement covered Lear Jet N 9108Z.  (*Id*., Ex. B-6 at 1).  The third security agreement covered Lear Jet N 140GC.  (*Id*., Ex. B-7 at 1).  The fourth security agreement covered Lear Jet N 535TA.  (*Id*., Ex. B-8 at 1).  The fifth security agreement covered Lear Jets N 988AS and N 251DS.  (*Id*., Ex. B-9 at 1).

Security Agreements defined a condition of default to include any failure to perform any agreement made to the Secured Party.  (*Id.*).

On May 20, 2004, the FAA issued an emergency order suspending the airworthiness certificates for Air Ambulance's eight Lear Jets.  (Docket Entry No. 136, Ex. K-9).  The FAA found numerous critical problems in the flight and maintenance records for each of the eight Lear Jets, stating that the times and cycles shown in the B&C Flight Management records were "not correct because they were fabricated by B&C or were derived from data taken from fabricated B&C documents."  (*Id*. at Counts I - VIII).  The FAA determined that "the company has not been recording all of the flight time for any of the aircraft, and it has systematically reduced the numbers of hours and cycles on them, resulting in required maintenance and inspections being significantly delayed or omitted and the aircraft being unairworthy.  The true total time and cycles, which trigger maintenance actions for these aircraft, are unknown.  Therefore, this action is taken to suspend the airworthiness certificates of the aircraft . . . until such time as the FAA can determine that they have been returned to conformity with their type certificates."  (*Id.,* Determination of Emergency).        On June 2, 2004, the FAA issued an emergency order revoking B&C Flight Management's Air Carrier Certificate based on "consistent findings of deceptive, false record keeping."  (*Id*., Ex. K-10).  The FAA found that B&C Flight Management had "made, or caused to be made, entries in the maintenance records of all the Learjet aircraft on its operations specifications . . . [that] were false and designed to mislead . . . . These false statements include, but are not limited to, reduced numbers of hours on the aircraft, reduced numbers of cycles on the

4

aircraft, statements that required inspections had been accomplished when they hadn't been, and entries reciting the accomplishment of Airworthiness Directives (ADs) that had not been done." (*Id.*, Determination of Emergency).  The FAA found that B&C Flight Management had operated aircraft without "complying with required maintenance inspections, without complying with applicable airworthiness directives, and without replacing life limited parts in a timely manner. . . . B&C operated the aircraft when they were not in an airworthy condition. . . . The entries were false and designed to mislead the FAA. . . . B&C operated these aircraft with management's full knowledge of these type falsifications and in complete disregard of the danger these unairworthy aircraft presented to the public and the crews that operated them." (*Id.*, Ex. K-10).  Air Ambulance was unable to operate without the airworthiness certificates for its planes and without the air carrier certificate for B&C Flight Management.[3]

On June 2, 2004, Whitney Bank notified Air Ambulance of its default under the loan agreement based on the FAA actions.  On June 4, 2004, Whitney Bank accelerated the May 7, 2004 Commercial Note.  (Docket Entry No. 136, Exs. B-10, B-11).  On June 7, 2004, Whitney Bank filed this suit against Air Ambulance, B&C Flight Management, and Horridge, seeking a temporary restraining order to prevent Horridge from transferring or

---

[3]Horridge testified in his deposition that he believed three pilots who planned to compete with him "manipulated the forms." (Docket Entry No. 136, Ex. C at 121).  He also testified that the "hours and cycles were correct to start with," but that the "FAA was trying to destroy our company.  They had a special mission." (*Id.*, Ex. E at 27).

damaging the aircraft that served as collateral for the loan.  (Docket Entry No. 1).[4]  This court

entered a temporary restraining order sequestering the aircraft.  (Docket Entry Nos. 3, 4).

On June 24, 2004, this court entered an agreed preliminary injunction preventing Horridge

from transferring or damaging the aircraft and transferring possession to Whitney Bank.

(Docket Entry No. 15).  On July 15, 2004, Whitney Bank sought and obtained another

temporary restraining order prohibiting Horridge, Air Ambulance, and B&C Management

from transferring any assets.  Whitney Bank based its application for this expanded

temporary restraining order on evidence that it had discovered new information about

Horridge's past and present asset transfers, bankruptcy filings, and other litigation, which

Whitney Bank claimed were fraudulent.  (Docket Entry No. 18).  That temporary restraining

order was extended on an agreed basis on July 22, 2004.  (Docket Entry No. 27).

On June 17, 2004, B&C Flight Management reached a Settlement Agreement with the

FAA.  The FAA withdrew the order suspending the airworthiness certificates for the eight

Lear Jets but "retained custody" of the certificates; the planes could not be flown.  Under the

agreement, B&C Flight Management was to make a proposal to revise the records of takeoffs,

landings, and hours in flight for each aircraft, to bring the records into compliance with the

FAA regulations.  The FAA would then decide whether to approve the proposal for revising

the records for each aircraft including approval of the method to be used.  If the FAA issued

---

[4]  On November 14, 2005, Whitney Bank dismissed its claims against Air Ambulance and B&C
Flight Management.  (Docket Entry No. 57).  Whitney Bank later added as a defendant Horridge's former
wife, alleging fraudulent transfer of assets.  The claims involving Horridge's former wife have been resolved
through settlement.

6

the approval, and if the plane had the additional necessary maintenance work performed, and if that plane then passed FAA inspection, the airworthiness certificate for that plane would be returned.  (Docket Entry No. 136, Ex. K-14).  Pending this work, the FAA did not return the airworthiness certificates to B&C Flight Management.  As a result, the planes were not commercially operable.  The FAA also insisted that Horridge could not be involved in operating B&C Flight Management or in "any related activity."  (*Id.*, ¶ 14).

The Settlement Agreement was between B&C Flight Management and the FAA. Whitney Bank was not a party.  The Settlement Agreement referred to the suit filed by Whitney Bank, acknowledged that the aircraft were subject to a writ of sequestration issued in that suit instituted by Whitney Bank, and stated that B&C Flight Management was attempting to sell the aircraft "and/or its remaining operations to one or more unrelated parties, who pursuant to any such transaction will work with the FAA under the terms of this Order and agreement to return the Aircraft to service."  (*Id.*).  The Settlement Agreement did not refer to any obligation on the part of Whitney Bank to work with the FAA.

Horridge testified that he provided a proposal to the FAA that would calculate times and cycles for each of the aircraft, but that proposal was not acceptable to the FAA.  (Docket Entry No. 136, Ex. E at 27).  George Crow, an attorney who worked on Air Ambulance's aviation law matters, did not know of Horridge's failed attempt.  He worked with Horridge and two other Air Ambulance employees to make another proposal to the FAA.  (Docket Entry No. 136, Ex. J at 144).  B&C Flight Management made this proposal to the FAA for only one plane, the Lear Jet with registration number N 9108Z, which was among those

7

pledged to Whitney Bank.  (*Id*, Ex. J at 169.).[5]  To attempt to correct the records on flight hours and take offs and landings for that one aircraft, Crow obtained the FAA's air traffic control records, but the FAA records had many duplications and gaps.  (*Id*., Ex. J at 137, 141, 145).  To recreate the flight history of the plane, B&C Flight Management had to correlate and attempt to reconcile the FAA data with other records.  Crow testified that the process took more than 40 hours for one plane.  (*Id*. at 266).  Horridge  testified that the work occupied three or four employees for at least 30 days.  (Docket Entry No. 136, Ex. E at 30).  Crow testified that no one at Whitney Bank stopped anyone at Air Ambulance from working with the FAA.  (*Id*., Ex. D at 268).

It is undisputed that the only proposal submitted to the FAA to implement the first step of the FAA Settlement Agreement covered only one aircraft, the Lear Jet 9108Z.  Crow testified that no other work was done.  No repairs or maintenance were performed on the Lear Jet that had its records corrected because B&C Flight Management and Air Ambulance had no money for the work.  (Docket Entry No. 136, Ex. D at 267).  No work was done to correct the records on the other aircraft subject to the FAA suspension order because the focus had shifted to work on the Cheyenne and Cessna aircraft.  (*Id*.).  Although Horridge testified that work had been done on the records for the other Lear Jets, (*id.*, Ex. C at 126), he acknowledged that Crow was the one actually doing whatever work was being done.  Crow

---

[5] Crow testified that B&C Flight Management chose that plane because it was "without a doubt, the most valuable of the airplanes.  It had the most utilization capacity and range, and it also, I think had—since it was a little bit newer than some of them, had—given approval of the times and cycles number, would have had the least amount of maintenance."  (*Id*. at 169).

testified that he did no such work.  Horridge testified that Crow did not do the work or, if he did, failed to submit the records to the FAA because "he was working without retainer and an unpaid bill."  (*Id*., Ex. E at 49).

Crow testified that on October 8, 2004, David Donnell of the FAA left a message on Crow's answering machine that Crow interpreted as approving the proposal to correct the hours and cycles for the 9108Z.  (Docket Entry No. 136, Ex. J at 192; Docket Entry No. 154, Ex. C at 2; Docket Entry No. 136, Ex. B-16).  That message stated, "[y]our hours and cycles on 9108Z are good, were very acceptable to the Administrator."  (Docket Entry No. 136, Ex. J at 197).  The message also itemized "issues" that need to be resolved on a "discrepancy list." (*Id*. at 197–98).  The message asked Crow to contact a specific FAA inspector, asked for records, and asked for assistance in inspections.  The message stated that the speaker would "be back in the office on Tuesday."  (*Id*. at 201–03).  Crow did not return the call.  (*Id*. at 197, 206–07).[6]

A recording of the phone mail message was sent to Whitney Bank on March 21, 2005. (Docket Entry No. 136, Ex. B-20).  It is undisputed that the FAA did not issue any approval in writing of the proposal to determine the hours and cycles on one aircraft.  (Docket Entry No. 136, Ex. J at 186).  It is undisputed that B&C Flight Management did not submit a proposal to the FAA to correct the hours and cycles for any aircraft except the 9108Z.  And

---

[6]  Brian Ingraham, one of the experts Horridge designated, testified that he was "surprised" that the FAA did not issue an approval in writing.  He testified that in his experience "[FAA approval is] in writing and it's on FAA letterhead, or it's in an FAA e-mail which happens occasionally."  (*Id*. at 118, 121). Ingraham testified that he did not ask for an explanation, despite finding this "curious."  (*Id*. at 118–119). Ingraham testified that "I would say it was accepted; I don't think it was approved."  (*Id*. at 119).

it is undisputed that B&C Flight Management did not perform repairs or maintenance to that aircraft. (Docket Entry No. 136, Ex. J at 207). In short, only one of the steps required under the FAA Settlement Agreement was performed and only as to one aircraft, and no written approval was received as to that step.

On August 19, 2004, Whitney Bank notified counsel for Air Ambulance, B&C Management, and Horridge that it intended to conduct a private sale of the aircraft securing the loan. (Docket Entry No. 136, Ex. B at ¶ 18). Horridge transferred his Air Ambulance stock on August 19 or 20, 2004. (Docket Entry No. 136, Ex. C at 92–93). On August 20, 2004, Air Ambulance declared bankruptcy. (Docket Entry No. 136, Ex. C at ¶ 18). Whitney Bank obtained relief from the bankruptcy stay and sold the collateral in a private sale conducted with sealed bids.

Whitney Bank hired Sugar Land Jet Sales to conduct the sale. (*Id*. at ¶ 19). The sale was advertised in four aviation publications: Trade-A-Plane, Executive Controller, Controller, and Business Air Today. Over 500 emails were sent to aircraft dealers and brokers. (*Id*. at ¶ 21). Sugar Land Jet Sales responded to all inquiries and sent out over 100 bid packages on March 26 and March 27, 2005. (*Id*. at ¶ 22). The bid packages contained specification sheets for each plane and a copy of the FAA Settlement Agreement. The bid packages "notified all potential bidders that the aircraft and engine times and cycles were under dispute with the FAA and referred bidders to an individual at the FAA for further information concerning procedures to re-establish times and cycles." (*Id.; see also* Exs. G-1, G-2).

10

Twenty-two bids were received in May and June 2005. One failed because it was a contingency bid and the bidder was unable to obtain financing. (*Id.*, Docket Entry No. 136, Ex. G at 1–2). The successful bidders were Dodson International and Michael Scroggins, bidding $133,770 for one Cessna, and Dodson International, bidding $1,779,504 for the remaining aircraft. (*Id.*, Docket Entry No. 136, Ex. G at 2). Deducting interest on the loan, commissions to Sugar Land Sales, outstanding liens on the aircraft, and costs related to the sale, Whitney Bank calculated the deficiency at $4,827,393.22. (Docket Entry No. 139, Ex. B at 7).

Horridge has asserted the affirmative defense that the sale was not commercially reasonable. Horridge alleges that the sale was commercially unreasonable primarily because Whitney Bank failed to regain the airworthiness certificates the aircraft before the sale. (Docket Entry No. 154).

Horridge designated three witnesses—himself, George Crow, and Brian Ingraham— to testify that Whitney Bank's auction was not "commercially reasonable" under Texas law. (Docket Entry No. 139, Exs. A, C, E). Each opined that Whitney Bank had a duty to complete B&C Flight Management's obligations under the FAA Settlement Agreement and regain the airworthiness certificates before selling the planes. They also opined that Whitney Bank should have disclosed to prospective bidders that the FAA had approved a method for reestablishing the times and cycles of the aircraft, referring to the telephone message. (Docket Entry No. 154). Ingraham also testified that Whitney Bank should have accepted one

11

contingent bid and loaned that bidder funds when it could not achieve financing on its own, and that Whitney Bank was premature in seizing the aircraft in the first place.

Whitney Bank has moved for partial summary judgment on the deficiency owed. (Docket Entry No. 136).  Horridge has responded.  (Docket Entry No. 153).  Whitney Bank has moved to exclude the testimony of these witnesses on the commercial reasonableness of the sale, arguing that because it had no legal duty to perform B&C Flight Management's obligations under the FAA Settlement Agreement to reinstate the airworthiness certificates, the opinion that it was commercially unreasonable to sell the collateral without doing so is irrelevant.  Whitney Bank also argues that Ingraham is not qualified to give many of the opinions he expressed and that his testimony is unreliable.  (Docket Entry No. 139).

## II.   The Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together  with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-moving party.  *Id.* at 248.  The court must draw all reasonable inferences in favor of the non-moving party.  *Id.* at 255.  Because Whitney Bank has the burden of proof on the deficiency issue, it cannot obtain summary judgment unless its own submissions present conclusive evidence showing that it is entitled to judgment as a matter of law.  *See Torres Vargas v. Santiago Cummings*, 149 F.3d 29 (1st Cir. 1998) (citing *Fontenot v. Upjohn*

12

*Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986)); *see also Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003); *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

## III.   Commercial Reasonableness

Section 9.610 of the Texas Business and Commerce Code states that "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." TEX. BUS. & COMM. CODE § 9.610(a).  Section 9.610(b) continues:

> Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

*Id.* at § 9.610(b).  The Uniform Commercial Code Comment explains as follows:

> **4.     Pre-Disposition Preparation and Processing**.  Former Section 9-504(1) appeared to give the secured party the choice of disposing of collateral either "in its then condition or following any commercially reasonable preparation or processing." Some courts held that the "commercially reasonable" standard of former Section 9-504(3) nevertheless could impose an affirmative duty on the secured party to process or prepare the collateral prior to disposition. Subsection (a) retains the substance of the quoted language. Although courts should not be quick to impose a duty of preparation or processing on the secured party, subsection (a) does not grant the secured party the right to dispose of the collateral "in its then condition" under all circumstances. A secured party may not dispose of collateral "in its then condition" when, taking into account the costs and probable benefits of preparation or processing and the fact that the secured party would be advancing the costs at its risk, it

13

would be commercially unreasonable to dispose of the collateral
in that condition.

Section 9.627 addresses the "Determination of Whether Conduct was Commercially

Reasonable."  It states:

>  (a) The fact that a greater amount could have been obtained by a
>  collection, enforcement, disposition, or acceptance at a different
>  time or in a different method from that selected by the secured
>  party is not of itself sufficient to preclude the secured party from
>  establishing that the collection, enforcement, disposition, or
>  acceptance was made in a commercially reasonable manner.
>
>  (b) A disposition of collateral is made in a commercially
>  reasonable manner if the disposition is made:
>  (1) in the usual manner on any recognized market;
>  (2) at the price current in any recognized market at the time of
>  the disposition; or
>  (3) otherwise in conformity with reasonable commercial practices
>  among dealers in the type of property that was the subject of the
>  disposition.

*Id.* at § 9.627.

Whether a sale of collateral was reasonable is a fact question.  *Morgan Stanley Dean
Witter Credit Corp. v. Griffin*, 2002 WL 463312 (Tex. App.—Austin 2002, no writ); *Gordon
& Assoc. v. Cullen Bank Citywest, N. A.*, 880 S.W.2d 93, 96 (Tex.App.—Corpus Christi 1994,
no writ).  Summary judgment is appropriate if there is no genuine disputed issue of fact and
the lender is entitled to judgment as a matter of law.  Because the debtor, Horridge, raised the
issue of commercial reasonableness, Whitney Bank has the burden to show that its sale was
commercially reasonable.   TEX. BUS. & COMM. CODE § 9.626;   *Lister v. Lee-Swofford
Investments, L.L.P.*, 195 S.W.3d 746, 748 (Tex. App.—Amarillo 2006).  Proof that a greater

14

amount could have been obtained for the collateral by its disposition in a different method is not sufficient to preclude a showing of commercial reasonableness.  At the same time, "[a] low sales price suggests the court should scrutinize carefully all aspects of the disposition to insure each aspect was commercially reasonable."  *Lister,* 195 S.W.3d at 748.

The Business and Commerce Code provides a nonexclusive list of commercially reasonable dispositions, which include those made "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition."  TEX. BUS. & COMM. CODE § 9.627(b)(3).  Courts have considered various factors to evaluate the commercial reasonableness of a disposition, including "whether the secured party endeavored to obtain the best price possible, whether the sale was private or public, the condition of the collateral and any efforts made to enhance its condition, the advertising undertaken, the number of bids received and the method employed in soliciting bids."  *Lister*, 195 S.W.3d at 749 (collecting cases).

 Horridge does not challenge the choice of the company that handled the sale or the way in which the sale was advertised or the notice provided.  Horridge does not allege, and the record does not reflect, that the general approach used to auction the aircraft was unreasonable. *Cf. Heller Financial Leasing, Inc. v. Gordon*, 2006 WL 850914, at *4–5 (N.D. Ill. 2006) (finding fact questions as to whether aircraft were devalued by secured creditor's use of plane, insufficient advertising, declined offer, and delay).  Horridge also does not allege, and the record does not show, that the aircraft were undervalued considering their absence of  airworthiness certificates.  (Docket Entry No. 136, Ex. J at 216).  Instead,

Horridge alleges that Whitney Bank had an affirmative duty to improve the condition (and value) of the planes by performing work to correct the records, performing necessary maintenance, and passing FAA inspection to regain the aircraft's airworthiness certifications. (Docket Entry No. 154 at 5).  Horridge also argues that Whitney Bank had a duty to notify bidders that "the FAA had approved a method for reestablishing the hours and cycles." (*Id.*).

The reported cases show that in some circumstances, minor repairs or minor improvements may be required to make a sale commercially reasonable. *See, e.g., All-States Leasing Co. v. Ochs*, 600 P.2d 899 (Or. App. 1979) (failure to repair computer system relevant fact); *Liberty Weiss v. Northwest Acceptance Corp.*, 546 P.2d 1065 (Or. 1976) (washing and cleaning trucks); *In Re Bryan*, 20 UCCRS 571 (S.D. Ohio 1976) (cleaning and repairing a mobile home).  Horridge has not cited a case holding that a lender seeking to sell a complex piece of equipment, such as an airplane, must perform extensive and expensive repair or maintenance work to make the sale commercially reasonable.  Horridge has not cited a case holding that a lender seeking to sell equipment that no longer complies with regulatory requirements for operation is required to bring the equipment back into full compliance before the sale can be commercially reasonable.

Under the Texas Business & Commercial Code § 9.610(b), the issue is whether, "taking into account the costs and probable benefits of preparation or processing and the fact that the secured party would be advancing the costs at its risk, it would be commercially unreasonable to dispose of the collateral in that condition."  TEX. BUS. & COMM. CODE § 9.610(b), cmt. 4.  Whitney Bank was not a subsequent owner of the aircraft or a party to the

16

Settlement Agreement with the FAA.  The Agreement made it clear that only an owner or subsequent owner had any obligation under the FAA Settlement Agreement.  The undisputed facts in the record, or disputed facts taken in the light most favorable to the nonmovant, show the extent and uncertainty of the work that remained to be done before any of the aircraft could have their certificates of airworthiness restored.  To regain the airworthiness certificates required creating proposals of times and cycles for each aircraft, submitting them to the FAA, and receiving approvals from the FAA.  (Docket Entry No. 136, Ex. J at 140, Ex. E at 30). The work necessary to submit such a proposal  had been performed only on one of the Lear Jets.  That work took an extensive amount of time and expertise, with estimates ranging from in excess of 40 hours expended by Crow and others assisting him to a month of time expended by Horridge, Crow, and others.

Crow testified that an FAA representative left a telephone message that "[y]our hours and cycles on 9108Z are good, were very acceptable to the Administrator."  (Docket Entry No. 136, Ex. J at 197).  The message indicated that some issues remained, but the call was not returned.  No written FAA approval followed.  Even assuming that the FAA had indicated its approval of the proposal and the method used and that a formal acceptance would have followed if B&C Flight Management had pursued it, it is undisputed that B&C Flight Management did not pursue formal approval for that plane, correct the times and cycles for any other plane, or perform any of the maintenance and repair work on any plane.

Until the times and cycles were corrected for each of the aircraft, the amount of work, time, and money needed to complete the maintenance and repairs were speculative.  The

repair proposal submitted to Whitney Bank on July 2, 2004 shows that the "Short-term Cost" was estimated at $15,000, $62,500, $53,500, $6,500, $13,000, and $115,000 for each Lear Jet. (Docket Entry No. 136, Ex. K-12 at 5). The chart also shows "Later Cost" of "260,000.00 or rent 200/hr" for two of the Lear Jets. (*Id.*). A notation at the bottom of the chart states "Before 12/31/04 each Lear will also need RVSM @ $100,000 each." (*Id.*). The cost estimated to repair the Lear Jets was as high as $1,485,500 and the time required ranged to as much as three weeks for two of the jets. (*Id.*). Horridge and Crow acknowledged that this was an estimate. (Docket Entry No. 136, Ex. E at 62–63; Ex. J at 210). Horridge opined that it would cost approximately $576,000 to perform the work necessary to obtain FAA airworthiness certificates for the planes. (Docket Entry No. 139, Ex. A at 2). The record also shows that if Whitney Bank did receive the approval and performed maintenance, the FAA would have to inspect the planes again. The cases discussing aircraft sold in deficiency sales do not impose a duty to perform such extensive, expensive, burdensome, and uncertain work on a lender to make its sale of collateral commercially reasonable.

In *Dynalectron Corp. v Jack Richards Aircraft Co.*, 337 F. Supp. 659 (W.D. Okla. 1972), the record showed that the lender did not take any steps to prepare the airplane for sale or advertise the sale in appropriate publications, making the sale not commercially reasonable. The court found that the costs, including ground insurance, airport fees, and engine expenses, would have been $300 a month for an aircraft that later sold for $22,500.00. *Id.* at 662. This case did not involve extensive or uncertain repair or maintenance work. By contrast, in *Grumman Credit Corp. v. Rivair Flying Service, Inc.*, 845 P.2d 182 (Okl. 1992), and *Bank of*

*Oklahoma, N. A. v. Little Judy Industries, Inc.*, 387 So.2d 1002 (Fla. App. 1980), the courts found that there was no duty to perform extensive and expensive repairs on aircraft. In *Bank of Oklahoma*, the court found procedural problems with the sale, and the case was remanded to determine fair market value, which is not at issue in this case. *Id.* at 1005. In *Grumman*, a jury concluded that the sale of aircraft in disrepair was commercially reasonable. In that case, the repair work was estimated at $8,000 and, if repaired, the plane would have been worth up to $13,000. The jury concluded that the sale, which without the repair work performed resulted in a price of $6,000, was commercially reasonable. 845 P.2d at 182-184.

Under Texas law, "courts should not be quick to impose a duty of preparation or processing on the secured party." TEX. BUS. & COMM. CODE § 9.627(a), n.4. In some cases, a creditor might have a duty to prepare the collateral if that preparation is part of the usual practice. *See, e.g., Liberty Nat. Bank & Trust Co. v Acme Tool Div. of Rucker Co.*, 540 F2d 1375 (10th Cir. 1976) (cleaning and painting an oil rig found to be usual practice); *Mt. Vernon Dodge, Inc. v Seattle-First Nat. Bank*, 570 P2d 702 (Wash. App. 1977) (minor body work to automobiles); *In Re Bryan*, 20 UCCRS 571 (S.D. Ohio 1976) (cleaning and repairing a mobile home found to be usual practice). There is no testimony in this case that it is usual practice for a lender selling an airplane in a deficiency sale to have to restore that airplane's airworthiness certificate, if it has been suspended, by recreating the record of times and cycles, performing the maintenance and inspections shown to be necessary, and passing FAA inspection. None of the expert testimony Horridge relies on shows that such work is customary. The facts on which the designated expert witnesses rely to reach their own

opinions show that as a matter of law, there was no duty on the part of Whitney Bank to restore the airworthiness certificates to make the sale of the aircraft commercially reasonable.

Horridge also argued that Whitney Bank's sale was not commercially reasonable because it failed to notify bidders that "the FAA had approved a method for reestablishing the hours and cycles." (Docket Entry No. 154 at 5). This argument fails to create a fact issue as to commercial reasonableness on several grounds. First, the FAA did not issue a formal, written approval. Second, the telephone message approval was only as to a single aircraft and raised issues that were not resolved. Third, Whitney Bank provided the FAA Settlement Agreement, which would allow any prospective bidder to learn the processes required to regain the certifications. Fourth, Whitney Bank provided both the email and the phone number of a contact at the FAA to inquire about the status of the certifications. (Docket Entry No. 136, Ex. G-1 at AIRAM 8131).

The opinions of the expert witnesses do not create a fact issue as to commercial reasonableness because the witnesses assumed that Whitney Bank had a duty to repair the aircraft, which as a matter of law, based on the undisputed facts in the record, it did not have. The facts the witnesses relied on for their opinion establishes that, as a matter of law, no such duty was present. The witness also testified that Whitney Bank should have taken other steps that the record shows either were taken or were beyond the witnesses' competence to testify about. As explained below, these flaws and others require the exclusion of their testimony on commercial reasonableness.

## III.   The Motion to Exclude Expert Testimony

20

### A.    The Legal Standard

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if
> (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and
> methods, and
> (3) the witness has applied the principles and methods reliably to
> the facts of the case.

FED. R. EVID. 702.  Rule 702 "charges trial courts to act as 'gate-keepers,' making a
'preliminary assessment of whether the reasoning or methodology underlying the testimony
is scientifically valid and of whether that reasoning or methodology properly can be applied
to the facts in issue.'"  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002)
(quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)); FED. R. EVID.
702 Advisory Committee Note.  Expert testimony must be both "relevant and reliable" to be
admissible.  *United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) (quoting *Pipitone*, 288
F.3d at 243–44); *Daubert*, 509 U.S. at 589 (stating that "under the Rules the trial judge must
ensure that any and all scientific testimony or evidence admitted is not only relevant, but
reliable").

Witnesses may be qualified as experts if they possess specialized knowledge, skill,
experience, training, or education.  FED. R. EVID. 702.  The Fifth Circuit has stated that an
expert must have expertise in the general area in which he testifies, but need not have

expertise in the specialized area directly pertinent to the issues in question. *United States v. Marler*, 614 F.2d 47, 50 (5th Cir. 1980). The court must determine whether the proposed expert's training or experience are sufficiently related to the issues and evidence before the court that the expert's testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004).

A court must determine relevance by asking whether the expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *Daubert*, 509 U.S. at 591; *Pipitone*, 288 F.3d at 245. In making its reliability determination, the court should not decide the validity of the expert's conclusions, but instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594–95; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001). The considerations apply to all types of expert testimony, whether based on "scientific, technical, or other specialized knowledge." FED. R. EVID. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48 (1999); *Tucker*, 345 F.3d at 327.

Several factors guide a district court's inquiry into the reliability of expert testimony. The reliability factors from *Daubert* include whether the expert's technique or theory can be or has been tested; whether it has been subjected to peer review and publication; whether it has a known or potential rate of error or standards and controls guiding its operation; and whether it has been generally accepted in the scientific community. *Pipitone*, 288 F.3d at 244

(citing *Daubert*, 509 U.S. at 593).  Other factors include: whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); whether the expert has adequately accounted for obvious alternative explanations, *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994); whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); and whether the expert's claimed field of expertise is known to reach reliable results for the type of opinion the expert would give, *Kumho Tire Co.*, 526 U.S. at 151.

The test for reliability is flexible.  The specific factors listed in *Daubert* and its progeny neither necessarily nor exclusively apply to all experts or in every case.  *Kumho Tire Co.*, 526 U.S. at 150.  A district court has latitude to decide *how* to determine reliability as well as to make the ultimate reliability determination.  *Id.* at 152.  The trial court's role as gatekeeper is not intended to replace the adversary system; "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *Pipitone*, 288 F.3d at 250.  "[A] trial court must take care not to transform a *Daubert* hearing into a trial on the merits."  *Pipitone*, 288 F.3d at 250.

Admissibility of expert testimony is an issue for the trial judge to resolve under Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592–93; *Brumley*, 200 F.R.D. at 601. The party offering the testimony must prove by a preponderance of the evidence that the expert's opinion is relevant and reliable. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Brumley*, 200 F.R.D. at 601. "A trial court's ruling regarding admissibility of expert testimony is protected by an ambit of discretion and must be sustained unless manifestly erroneous." *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995).

## B.      Relevance and Reliability

Ingraham, Crow, and Horridge all testified that Whitney Bank had a duty to regain the airworthiness certification of the aircraft. (Docket Entry No. 136, Ex. J at 270–73, Ex. B. at 19–21; Docket Entry No. 139, Ex. F at 98). Their testimony assumes a legal duty that the record does not support.

The witnesses testified that regaining airworthiness certificates would increase the value of the aircraft, which is undisputed. None of these witnesses testified that regaining the certificates was standard practice. Instead, the witnesses assumed that the lender was required to receive "top dollar," and then speculated as to the methods Whitney Bank was obligated to use. (Docket Entry No. 136, Ex. J at 270–73, Ex. B. at 19–21; Docket Entry No. 139, Ex. F at 98). Ingraham's testimony was also based on the admittedly false assumption that proposals for correcting the hours and cycles on each aircraft had been submitted to the FAA

and approved. (Docket Entry No. 139 Ex. F at 109, 110).  He incorrectly assumed "that the FAA had been provided, had accepted the methodology for the reconciliation of the time and cycles on each aircraft."  (*Id.* at 111).  Ingraham also incorrectly assumed that the FAA Settlement Agreement had not been provided to potential buyers.  (*Id.* at 162).

Incorrect assumptions critical to an expert's opinion make that opinion unreliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998) (reliance on inaccurate information makes an expert's analysis and testimony inadmissible); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) ("An opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse."); *see also Advanced Display Systems, Inc. v. Kent State Univ.*, 2002 WL 1489555 (N.D. Tex. 2002) (expert assumed that fees paid were "lump sum paid-up royalty," made assumptions about hypothetical negotiation and incorrectly interpreted testimony).

### C.    Testimony Outside the Area of Expertise

Ingraham opined that the aircraft were undervalued and that the sale was not commercially unreasonable because Whitney Bank "acted in haste to remove the aircraft . . . before the airworthiness dispute could be rectified," even though the "FAA was in fact willing to open dialogue to rectify the situation."  (Docket Entry No. 154, Ex. 3-A at 5). However, the record shows that Whitney Bank did not block B&C Flight Management's efforts to work with the FAA after seizing the aircraft.  George Crow testified that Whitney Bank never hampered his efforts to work with the FAA.  (Docket Entry No. 139, Ex. D at 268)  In his deposition, Ingraham testified that he was aware of no action that Whitney Bank

took to prevent B&C Flight Management from working with the FAA after Whitney Bank seized the aircraft.  (*Id*. at 137).  Ingraham also testified that B&C Flight Management needed no assistance from Whitney Bank to send reconciliations to the FAA.  (*Id*. at 127).  The record shows that Ingraham's own testimony undermines the conclusions in his expert report.

Whitney Bank has objected to Ingraham's testimony about banking practices, the reasonableness of the conduct of the bank, or  a lender's duties upon a borrower's default. Ingraham testified that one of the bids, which was contingent on funding, should have been accepted and that Whitney Bank had the obligation to provide the financing.  (Docket Entry No. 154, Ex. 3-A at 6).  Ingraham's speculation that Whitney Bank should have funded the bidder's effort to acquire the planes is beyond his area of knowledge and has no basis in the facts.  Ingraham's testimony that  the bank "acted in haste," in seizing the aircraft is beyond his area of knowledge and has no basis in the facts.  Ingraham admitted that he is "not a banking expert or anything like that."  (Docket Entry No. 136, Ex. F at 81, 138).  Ingraham's testimony about banking practices is simply beyond his expertise, providing an additional basis for exclusion.

**IV.    Conclusion**

Whitney Bank's motion for partial summary judgment on the deficiency owed and its motion to exclude the testimony of the witnesses designated as experts on the commercial

reasonableness of the sale are granted.

SIGNED on May 1, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge