# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-04-2220 |
| | § | |
| AIR AMBULANCE BY B&C FLIGHT | § | |
| MANAGEMENT, INC., B&C FLIGHT | § | |
| MGMT, INC., AND ROY G. HORRIDGE, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION SETTING OUT
## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDERING
## SUBMISSION OF PROPOSED JUDGMENT

On June 8, 2004, Whitney National Bank ("Whitney Bank") filed this lawsuit against Air Ambulance by B&C Flight Management, Inc. ("Air Ambulance"), B&C Flight Management, Inc. ("B&C Flight Management"), and Roy G. Horridge, the sole shareholder, president, and operator of the companies. Whitney Bank sued to collect a May 7, 2004 loan to Air Ambulance in the principal amount of $5,685,597.00, secured by aircraft and by guaranties, including Horridge's personal guaranty. Whitney Bank obtained orders allowing it to foreclose on the aircraft that served as collateral. The sale of the aircraft resulted in a deficiency of $4,827,393.22 as of February 1, 2007.

In this suit, Whitney Bank asserted causes of action against Horridge for breach of contract, fraudulent misrepresentations made to secure the May 7, 2004 loan, and fraudulent transfers of assets.

On November 14, 2005, Whitney Bank dismissed its claims against Air Ambulance and B&C Flight Management.  (Docket Entry No. 57).  Whitney Bank later added as a defendant Horridge's former wife, Jillie Jacorro.  Whitney Bank's claims against her were resolved through settlement, and she was dismissed from this suit.

Horridge counterclaimed against Whitney Bank, alleging tortious interference and fraud.  He also asserted the affirmative defense that Whitney Bank's sale of the aircraft securing the loans after foreclosure was not commercially reasonable.  The parties conducted discovery and filed motions for summary judgment.  This court's rulings on those motions resolved all the claims, affirmative defenses, and counterclaims except Whitney Bank's claims against Horridge for fraud related to the May 7, 2004 loan and guaranty and for fraudulent transfers intended to place assets out of Whitney Bank's reach.  In prior rulings, this court granted Whitney Bank's motion for partial summary judgment on the breach of contract claim, establishing the Bank's right to recover the unpaid principal and interest remaining after the sale of the collateral.  (Docket Entry No. 139).  In that ruling, this court held that the sale of the collateral was commercially reasonable as a matter of law.  This court also held that as a matter of law, Whitney Bank was entitled to summary judgment on Horridge's counterclaims for tortious interference and fraud.  (*Id*.).

On May 21, 2007, this court held a bench trial on Whitney Bank's remaining claims against Horridge: fraud, and fraudulent transfer of assets relating to the May 7, 2004 loan. The court heard testimony from Philip Whitham, vice-president of Whitney Bank, and Robert Ramey, a loan officer at Whitney Bank, both of whom worked on the May 7, 2004

2

loan and guaranty.  The court also considered testimony from Horridge given in depositions taken on December 23, 2004, July 13, 2006, and December 5, 2006, and exhibits admitted into evidence.

Based on the record, the parties' submissions, the evidence, the arguments of counsel, and the applicable law, this court finds that Horridge made fraudulent misrepresentations in the loan documents that induced Whitney Bank to make the loan and guaranties in May 7, 2004, that Horridge fraudulently transferred certain assets to shield them from collection to satisfy the debt owed to Whitney Bank, and that Whitney Bank is entitled to judgment against Horridge on these claims.  This court enters the following findings of fact and conclusions of law in support of this judgment.  This court also orders Whitney Bank to submit a proposed final judgment consistent with the prior orders of this court and with these findings of fact and conclusions of law, no later than June 15, 2007.  Horridge may respond by June 29, 2007.

## I.    Findings of Fact

### A.    The Parties

Whitney National Bank is a national bank with its principal place of business in New Orleans, Louisiana.

Roy G. Horridge is a Texas resident.  In 1970, he started an air-ambulance business based in Kansas City, transporting people to medical facilities in Houston.  In the mid-1970s, Horridge bought part of one Missouri bank and all of another.  Horridge was a bank officer from 1976 to 1990.

In the early 1990s, Horridge formed a consulting company that he owned and operated, B&C Flight Management, Inc.  Horridge also formed, owned, and operated  Air Ambulance by B&C Flight Management, Inc.  Both Air Ambulance by B&C Flight Management and B&C Flight Management are Nevada corporations.  Horridge used B&C Flight Management as the holding company to own the aircraft used by Air Ambulance and to hold the Federal Aviation Agency air carrier operating certificate necessary for Air Ambulance to operate.  Horridge has been the sole owner of both companies since they were founded, as well as the president.  Horridge also founded and owned Business and Commercial Aviation Consultants Group, Inc. ("BCAC").

Horridge was married to Jillie Jacorro in November 1977.  Horridge was married to Jacorro when this lawsuit was filed.

### B.    Findings of Fact Relating to the 2004 Loan from Whitney Bank

Beginning in 2002, Whitney Bank made several loans to Air Ambulance, secured by aircraft owned by B&C Flight Management as well as by a corporate guaranty and Horridge's personal guaranty.   The loan dates and amounts were as follows:

- The first loan, executed on March 19, 2002, was in the amount of $1,453,519.31.  (Plaintiff's Exs. 24–27).  Three aircraft served as collateral for that loan, two Cessnas and one Lear Jet.

- The second loan, executed on November 20, 2002, was in the additional amount of $2,100,000.  (Plaintiff's Exs. 28–32).  In addition to the three aircraft securing the initial loan, this loan was secured by  two additional Lear

Jets.

- The third loan, executed on May 21, 2003, was in the additional amount of $1,250,000.  (Plaintiff's Exs. 34–37).  A Lear Jet was added to the already pledged collateral.

- The fourth loan, executed on July 25, 2003, was  in the additional amount of $1,325,000.  (Plaintiff's Exs. 40– 43).  The collateral for that loan was the previous collateral and two additional Lear Jets, bringing the total collateral to two Cessnas and six Lear Jets.   As of April 2004, Air Ambulance's outstanding indebtedness to Whitney Bank exceeded $4.5 million.

- The final loan, executed on May 7, 2004, renewed, consolidated, and extended the existing debt and added $1 million in additional loan proceeds.  The loan documents included the Commercial Note, First Amended and Restated Commercial Business Loan Agreement, (Restated) Continuing Guaranty, and a Ratification of Previously Executed Security Agreements.   The loan documents also include five Aircraft Security Agreements, two dated November 20, 2002, the others dated March 19, 2002, May 21, 2003, and July 25, 2003.  The nine-page composite Commercial Note stated that it "represents a renewal, extension, increase and rearrangement, but not a novation, of those certain promissory notes left due and owing by the Borrower, including that one certain promissory note, in the original principal amount of $1,453,519.31, dated March 19, 2002, that one certain promissory note in the original

5

principal amount of $2,100,000.00, dated November 20, 2002, and that one certain promissory note in the original principal amount of $1,250,000.00, dated May 21, 2003, and that one certain promissory note in the original principal amount of $1,315,000.000, dated July 25, 2003, each extended by the Borrower and payable to the order of the lender." The composite Commercial Note was in the principal amount of $5,685,597.00. Horridge and B&C Management guaranteed the debt, each signing a (Restated) Continuing Guaranty. The Commercial Note was secured by eight previously pledged aircraft, six Lear Jets and two Cessnas. The Ratification of Previously Executed Security Agreements reaffirmed the warranties and representations in each of the Aircraft Security Agreements that were executed in connection with the earlier loans.

Whitney Bank is the owner and holder of the notes, security agreeements, guaranties, and other loan documents relating to these loans.

On April 14, 2004, Horridge asked Whitney Bank to consolidate, renew, and extend the outstanding loans and to loan Air Ambulance an additional $1 million. (Plaintiff's Ex. 56). Whitney Bank asserts that Horridge made several misrepresentations to induce the Bank to agree to this loan. This court finds that Horridge knowingly made specific misrepresentations in the loan documents, intending Whitney Bank to rely on those representations. This court finds that Whitney Bank reasonably relied on those representations in entering into the May 7, 2004 loan and suffered damages as a result.

6

1.        The Misrepresentation as to the Purpose of the $1 Million Additional Loan

Robert Ramey testified that he did the underwriting of Horridge's April 14, 2004 request for a loan to Air Ambulance.  Philip Whitham also worked on this loan.  Both credibly testified that it was important to Whitney Bank to know the purpose for the loan. Before the May 7, 2004 loan documents were signed, Horridge told Ramey that he intended to use the $1 million of additional loan proceeds to purchase Able Air Ambulance, a company based in Florida.  Horridge told Ramey that he did not need the $1 million for capital or  to purchase companies other than Able Air Ambulance.   This conversation was followed by a written commitment letter dated April 30, 2004, which Horridge signed. Ramey received the signed letter around March 4, 2004.  That commitment letter stated that the loan's "Purpose" was:  "1) $4,685,597 to be used for the consolidation of WNB Loan: #10584, #10950, #11239, #11319 2) $1,000,000 to be used for the purchase of Able Air Ambulance, Inc." (Plaintiff's Ex. 165).

The statement as to the loan's purpose was repeated in May 7, 2004 First Amended and Restated Commercial Business Loan Agreement.  That Agreement stated:

> The proceeds from the Loan will be used for the following purpose(s):
> SOLELY FOR THE PURPOSE OF REFINANCING INDEBTEDNESS DUE AND OWING THE BANK IN THE APPROXIMATE OUTSTANDING PRINCIPAL AMOUNT OF  $4,685,597  AND  TO  FUND  APPROXIMATELY $1,000,000 FOR THE ACQUISITION OF ABLE AIR AMBULANCE, INC.

(Plaintiff's Ex. 64 at 1) (capitalization in original).

The representations as to the purpose of the loan in the credit request, the commitment letter, and the loan agreement were false when made, and Horridge knew that they were false. Horridge intended Whitney Bank to rely on these representations. In Horridge's depositions, he testified that when he applied for the loan in April 2004, he intended to use approximately $100,000 to $300,000 of the $1 million of new loan proceeds to purchase Able Air Ambulance. (Plaintiff's Ex. 161 at 206–09, Plaintiff's Ex. 162 at 146). When Horridge executed the May 7, 2004 loan documents, he intended to use most of the $1 million in additional loan proceeds to pay the day-to-day expenses of Air Ambulance and B&C Flight Management.

Whitney Bank reasonably relied on Horridge's false representations as to the purpose of the  new loan proceeds. Whitney Bank would not have agreed to the May 7, 2004 loan had it known that Horridge intended to use most of the $1 million in additional loan proceeds to pay the day-to-day expenses of Air Ambulance and B&C Flight Management.

Horridge and Air Ambulance did not use any of the $1 million additional loan proceeds to purchase Able Air Ambulance. Instead, they used the money to pay day-to-day expenses of Air Ambulance and B&C Flight Management. (Docket Entry No. 136, Ex. C at 219).

### 2.     The Misrepresentation as to the Absence of Any Investigation

The FAA requires an aircraft owner to keep accurate records of the hours the aircraft flies ("times" or "hours") and, for Lear Jets, when they take off and raise the landing gear and

8

land and lower the landing gear ("cycles").  This information determines what inspections and maintenance are required, as well as the length of service of certain parts.  (Docket Entry No. 136, Ex. C at 120-121; Docket Entry No.136, Ex. D at 83–84, 123-124).  Proper records of hours and cycles are required for FAA-issued aircraft airworthiness certificates, necessary for an aircraft to fly.

In March 2004, Horridge knew that the FAA was investigating the records of hours and cycles for the Air Ambulance aircraft.  The evidence shows, and this court finds, that Horridge fully understood that the FAA was conducting an investigation into whether the aircraft were airworthy.  Horridge himself referred to the FAA's action as an "investigation." (Plaintiff's Ex. 52; Plaintiff's Ex. 161 at 158–160, 171).  In a letter dated March 24, 2004, Horridge offered the FAA "full cooperation with the investigation."  (Plaintiff's Ex. 52). Horridge met with FAA inspectors to deliver records on March 26, 2004.  (Plaintiff's Ex. 161 at 162).  Horridge knew of the FAA investigation well before his April 2004 loan request to Whitney Bank.  Horridge did not tell Whitney Bank about the FAA investigation, the nature or extent of the problems with the aircraft records, or that he had shut down his operations to cooperate with the FAA investigation before the May 7, 2004 loan documents were executed.

Horridge's counsel argued that Horridge did not believe that the FAA investigation was serious.  The record fails to support this argument.  On March 8, 2004, Horridge sent a letter to Gene Dukes, a colleague, asking Dukes to help find a director of maintenance for Air Ambulance.  In that letter, Horridge stated, "In June 2003 I discovered errors in the flight

time and cycle records of Lear N1980JA (see attached letter to David Miller dated June 9, 2003).  By September 2003 I reviewed a number of our VIP-5 maintenance tracking forms and realized it appeared there were numerous errors."  (Defendant's Ex. 40).  On March 24, 2004, Horridge sent a letter to the FAA in which he discussed a former employee's unauthorized access to the aircraft records. (Plaintiff's Ex. 52).  On April 22, 2004, Horridge sent another letter to the FAA explaining that this employee had "removed many valuable aircraft record and maintenance squawk sheets from every aircraft that he had access to, and made numerous false entries."  (Plaintiff's Ex. 57 at 2).  In April 2004, Horridge voluntarily shut down Air Ambulance's operations because of the FAA investigation.  (Plaintiff's Ex. 161 at 169–171).  On May 3, 2004, four days before Horridge signed the loan documents, the FAA sent him a letter identifying "serious deficiencies" in the maintenance of the Lear Jets and formally demanding that the aircraft be reexamined to evaluate their airworthiness. (Plaintiff's Ex. 61).

When he applied for the loan in April 2004 and when he executed the May 7, 2004 loan documents, Horridge knew that the aircraft records had major deficiencies, which the FAA was investigating.  Horridge also knew that this investigation was serious and could be very damaging for Air Ambulance and B&C Flight Management.  In signing the First Amended and Restated Commercial Business Loan Agreement, Horridge specifically misrepresented to Whitney Bank that there was "no litigation, legal, or administrative proceeding, investigation, or other action of any nature pending or, to the knowledge of Obligor, threatened against or affecting Obligor which involves the possibility of any

10

judgment or liability not fully covered by insurance, and which may materially and adversely affect the business or assets of Obligor or Obligor's ability to carry on business as now conducted." (Plaintiff's Ex. 64 at section D(6)). This statement was false when made, and Horridge knew that it was false. Horridge made this statement intending that Whitney Bank would rely on it. Whitney Bank reasonably relied on this statement in making the May 7, 2004 loan. Whitney Bank would not have agreed to the May 7, 2004 loan had it known of the FAA investigation.

### 3. The Misrepresentation that the Aircraft Complied with FAA Requirements

The warranties and representations in each of the earlier Aircraft Security Agreements were reaffirmed in the Ratification of Previously Executed Security Agreements signed on May 7, 2004. (Plaintiff's Ex. 66). The Security Agreements specifically stated that the collateral would be maintained in conformity with the manufacturer's operating instructions, comply with FAA regulations, and be in airworthy condition. (Plaintiff's Exs. 27, 31, 32, 37, 41). The Security Agreements specifically represented that the planes and their engines were properly maintained, complied with FAA regulations, and were airworthy. By signing the May 7, 2004 loan documents, including the Security Agreements and Ratification of Previously Executed Security Agreements, Horridge represented that the aircraft had proper maintenance and records and were in compliance with FAA airworthiness regulations. In April and early May 2004, the aircraft did not have proper records, did not meet maintenance requirements, and did not meet FAA airworthiness regulations. The representations were

false when made, and Horridge knew that they were false.  Horridge intended Whitney Bank to rely on these representations.  Whitney Bank reasonably relied on Horridge's false representations that the aircraft, which were the means by which Air Ambulance did its business and were the collateral for Whitney Bank's $5 million loan, met FAA requirements. Whitney Bank would not have made the May 7, 2004 loan had it known that the aircraft had seriously deficient records and did not comply with FAA airworthiness requirements.

### 4.    Other Alleged Misrepresentations

In 1987, a judgment was entered against Jacorro, Horridge, and one of his previous companies, Twin City Leasing Corporation, for violations of the Racketeer and Corrupt Organizations Act, 18 U.S.C. § 1962, securities fraud, 15 U.S.C. § 78(b), statutory fraud, Tex. Bus. & Comm. Code § 27.01, common law fraud, civil conspiracy to defraud, and breach of obligation of good faith under the Texas Uniform Commercial Code.  (Plaintiff's Ex. 4).  Horridge filed bankruptcy on behalf of Twin City Leasing Corporation to prevent judgment from being entered against him in that lawsuit.  (Plaintiff's Exs. 5, 6)  Horridge and Jacorro filed personal bankruptcy in 1988 to prevent that judgment from being executed against them.  (Plaintiff's Ex. 7).  These bankruptcy actions were voluntarily dismissed.

Horridge provided Whitney Bank documents containing financial information dated December 30, 2000, October 1, 2002, April 28, 2003, February 10, 2004, and February 18, 2004.  (Plaintiff's Exs. 20, 21, 33, 49, 50).  In the documents Horridge provided, he answered questions asking for information about previous bankruptcies.  Horridge failed to disclose his previous bankruptcies in answering those questions.

Whitney Bank did not ask Horridge questions about prior bankruptcies in the May 7, 2004 loan documents themselves.  The Commercial Note, Loan Agreement, and guaranty contain merger clauses stating that these loan documents are "THE FINAL, ENTIRE AGREEMENT . . . AND SUPERCEDE[] ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL."  (Plaintiff's Exs. 63 at 4, 64 at 6, 7, 65 at 4) (capitalization in originals).  This language is inconsistent with Whitney Bank's assertion that in agreeing ths May 7, 2004 loan it relied on Horridge's prior misrepresentations that he had not previously filed for bankruptcy.

### 5. The FAA's Suspension and Revocation, Whitney Bank's Notice of Default and Acceleration, and the Sale of the Collateral

On May 20, 2004, the FAA issued an emergency order suspending the airworthiness certificates for Air Ambulance's eight Lear Jets.  The FAA found numerous critical problems in the flight and maintenance records for each of the eight Lear Jets.  (FAA "Determination of Emergency," Plaintiff's Ex. 75 at 04045).

On June 2, 2004, the FAA issued an emergency order revoking B&C Flight Management's Air Carrier Certificate based on "consistent findings of deceptive, false record keeping."  The FAA found that B&C Flight Management had operated aircraft without "complying with required maintenance inspections, without complying with applicable airworthiness directives, and without replacing life limited parts in a timely manner. . . . B&C operated the aircraft when they were not in an airworthy condition. . . . The entries were false

13

and designed to mislead the FAA. . . . B&C operated these aircraft with management's full knowledge of these type falsifications and in complete disregard of the danger these unairworthy aircraft presented to the public and the crews that operated them." (FAA "Emergency Order of Revocation," Plaintiff's Ex. 84).

Air Ambulance was unable to operate without the airworthiness certificates for its aircraft and without the Air Carrier Certificate for B&C Flight Management.

The security agreements pledging the aircraft as security for the Whitney Bank loan defined a condition of default to include any failure to perform any agreement made to Whitney Bank. On June 2, 2004, Whitney Bank notified Air Ambulance of its default based on the FAA actions. On June 4, 2004, Whitney Bank accelerated the May 7, 2004 note and related obligations. The default and acceleration were proper and Horridge received proper notice. On June 7, 2004, Whitney Bank filed this suit against Air Ambulance, B&C Flight Management, and Horridge, and obtained a temporary restraining order to prevent Horridge from transferring or damaging the aircraft that served as collateral for the loan. On June 24, 2004, this court entered an agreed preliminary injunction preventing Horridge from transferring or damaging the aircraft and transferring possession of the aircraft to Whitney Bank. On July 15, 2004, Whitney Bank sought and obtained another temporary restraining order prohibiting Horridge, Air Ambulance, and B&C Management from transferring any assets. Whitney Bank based its application for this expanded temporary restraining order on evidence that it had discovered new information about Horridge's past and present asset transfers and failure to disclose his prior bankruptcy filings, which Whitney Bank claimed

14

were fraudulent.  That temporary restraining order was extended on an agreed basis on July 22, 2004.  On August 3, 2004, this court entered a second agreed preliminary injunction signed by Horridge, prohibiting him from transferring, concealing, or destroying assets. (Docket Entry No. 44).

On August 19, 2004, Horridge signed a proxy appointing Dan Forgy, an accountant who performed work for B&C Flight Management, as his attorney-in-fact.  That proxy declared that Forgy "shall have full power and authority to exercise all rights of ownership with respect to [Air Ambulance and B&C]."  On August 20, 2004, Air Ambulance filed bankruptcy.  Whitney Bank obtained relief from the automatic stay in February 2005 and, after proper notice to Horridge, Air Ambulance, and B&C Flight Management, held a private sale of the aircraft via sealed bids.

This court has previously ruled that, as a matter of law, Whitney Bank conducted the sale in a commercially reasonably manner.  The reasonable and necessary expenses incurred in connection with the sale totaled $175,985.03.  The principal remaining on the May 7, 2004 loan after the sale was $4,059,443.58.  The interest rate is 5.5% per annum.  Whitney Bank has established its entitlement to a deficiency judgment in the amount of $4,651,408.19 as of February 2, 2007, plus $620.19 per day from February 2, 2007 until the date of judgment, as well as reasonable attorneys' fees.

The evidence shows that Whitney Bank's damages proximately caused by the fraudulent representations Horridge intentionally made to induce Whitney Bank to enter into the May 7, 2004 loan are the $1 million in proceeds added to the outstanding loans as well

as damages from the renewal and extension of the outstanding loans.

The evidence shows that given the false nature of the misrepresentations, Horridge's knowledge of their falsity, his intent to deceive Whitney Bank in order to obtain the May 7, 2004 loan, and the materiality of these misrepresentations to Whitney Bank's decision to renew and extend the existing loans and to add $1 million in new loan proceeds, exemplary damages are appropriate. The sum of $1 million is awarded to Whitney Bank from Horridge as exemplary damages for fraud.

## B.     Findings of Fact Relating to the Fraudulent Transfer Claim

Horridge and Jillie Jacorro were married in November 1977. They lived together at 14630 Bramblewood Drive, Houston, Texas, for approximately sixteen years.

In the 1990s, Horridge formed BCAC and owned that company until at least 2004.

In May 2004, Horridge and Jacorro owned three properties: 14630 Bramblewood in Houston, Texas; 6509 E. Monte Cristo in Scottsdale, Arizona; and 6833 E. Doubletree in Scottsdale, Arizona.

On May 21, 2004, the day after the FAA issued its emergency order suspending the airworthiness certificates of all of B&C Flight Management's Lear Jets, Horridge met with Whitney Bank officers, who told Horridge that they would not allow him to transfer the collateral securing the May 7, 2004 loan. (Plaintiff's Ex. 87-A).

On May 24, 2004 Horridge wrote a check in the amount of $100,988.01 on his individual checking account to BCAC. (Plaintiff's Ex. 76). Horridge testified that he could not recall precisely what the check was for; he thought it might have been to pay for "real

estate in Arizona." (Plaintiff's Ex. 162 at 63). On the same date, Horridge closed his individual bank account.

On June 1, 2004 Horridge and Jacorro signed a "Property Division Agreement." (Plaintiff's Ex. 83). In that agreement, BCAC is listed as Jacorro's separate property. Horridge testified in his deposition that Jacorro had been the "owner" of BCAC since 1999, when Horridge transferred the stock to her to persuade her not to divorce him. (Plaintiff's Ex. 162 at 70–72). This testimony is wholly lacking in credibility and in record support. The record shows that Horridge had owned BCAC since he formed it in the 1990s. The property division agreement noted a $321,000 loan from BCAC to the Monte Cristo property, but there is no documentation of that "loan" or when it was made. (Plaintiff's Ex. 83). Horridge and Jacorro temporarily transferred the titles of the Doubletree property and the Monte Cristo property to BCAC in 2001 and 2002. However, before this lawsuit was filed, they executed deeds transferring ownership of the Doubletree property and the Monte Cristo property back to themselves. (Plaintiff's Ex. 160 at 141–43; Ex. 162 at 120–23). At the time this lawsuit was filed, Horridge and Jacorro owned the Bramblewood property as their homestead under Texas law and also owned the Monte Cristo property and the Doubletree property.

On June 2, 2004, Whitney Bank notified Horridge of the default on the May 7, 2004 loan. On June 3, 2004, Whitney Bank accelerated the debt and notified Horridge.

On June 7, 2004, Whitney Bank filed this lawsuit. On June 7, 2004, Jacorro filed for divorce. This court's sequestration order was entered on June 9, 2004.

On June 10, 2004, the Doubletree property was sold. The net proceeds were

$521,366.22.  Jacorro received all these proceeds.  (Plaintiff's Ex. 89, 93).

On June 12, 2004, Horridge signed papers purporting to make Jacorro the "Director" of BCAC.  (Plaintiff's Ex. 94).  On June 30, 2004, Horridge and Jacorro executed a BCAC stock certificate giving sole ownership to Jacorro.  (Plaintiff's Ex. 18).  They backdated that certificate to June 20, 1999.  BCAC was not transferred to Jacorro on June 20, 1999.  Horridge remained the owner at that time.

On July 2, 2004, Horridge instructed the title company to wire $321,000 from the proceeds of the sale of the Monte Cristo property to BCAC.  (Plaintiff's Exs. 110, 148).  Horridge admitted in his deposition that he transferred this money to BCAC "really for nothing."  (Plaintiff's Ex. 162 at 94).  Jacorro received $125,982.07 of the proceeds of the sale of the Monte Cristo property, the money remaining after the transfer to BCAC.  (Plaintiff's Ex. 110).

Jacorro received all of the proceeds from the sale of the Doubletree property, $521,366.22, and $125,982.77 from the sale of the Monte Cristo property, the amount remaining after the $321,000 payment to BCAC.  Jacorro paid Horridge $62,991.07, approximately half from the money she received from the Monte Cristo property sale.  (Plaintiff's Exs. 89, 93, 82, 110, 115).

On July 15, 2004, this court entered a second temporary restraining order prohibiting Horridge from transferring assets.

On August 9, 2004, the District Court of Harris County, 312th Judicial District, entered a final decree of divorce between Horridge and Jacorro.  The divorce decree

recognized that Jacorro had a $245,000 lien on the Doubletree property for her contribution to the downpayment as her separate property.  (Plaintiff's Ex. 122 at 5).  Approximately $245,000 of the $442,000 downpayment for the Doubletree property came from Jacorro's retirement accounts, a 401(k) and an IRA, which Horridge cashed for the purchase. (Plaintiff's Ex. 160 at 128–29; Ex. 162 at 104).

The divorce decree stated that all the Monte Cristo property sale proceeds were to go to Jacorro and that Horridge and Jacorro were to receive equal amounts of the profits from the sale of the Doubletree property, less the $245,000 lien Jacorro received on that property. (Plaintiff's Ex. 122).  Jacorro instead paid Horridge half the proceeds from the Monte Cristo property sale and nothing from Doubletree property sale.  (Plaintiff's Ex. 160 at 153).

The divorce decree stated that Horridge would keep the Bramblewood property.  That property was exempt as a homestead.  The result was that Horridge received primarily exempt assets and Jacorro or BCAC received nonexempt assets.

Jacorro was awarded three vehicles in the divorce and property agreement, and Horridge was awarded one.

This court finds that the following are fraudulent transfers:

- The $321,000 payment to BCAC from the Monte Cristo property sale proceeds, which Horridge admitted was a transfer "really for nothing."

- The $62,991.70 payment to Jacorro from the Monte Cristo property sale (the $125,982.77 Jacorro received less the $62,991.07 she paid Horridge).

- The $276,366.22 payment to Jacorro from the Doubletree property sale (the

$521,366.22 in proceeds less the $245,000 lien Jacorro held on the property).

• Horridge's backdated transfer of BCAC stock to Jacorro.

• Horridge's transfer of $100,988.01 to BCAC from his personal bank account a few days after Horridge met with Whitney Bank officers following the FAA's suspended the airworthiness certificates.

The asset transfers set out above were made with the intent to hinder and delay collection by Whitney Bank, a creditor of Horridge. These transfers were made either just after Whitney Bank had made clear its intent to collect the debt or just after Whitney Bank filed this suit. The transfers were of substantially all Horridge's nonexempt assets. Horridge was insolvent at the time of the transfers. The transfers removed assets from Whitney Bank's access. The payments to BCAC and the BCAC stock transfer to Jacorro were not for reasonably equivalent value.

## III.   Conclusions of Law[1]

As this court has previously held, Whitney Bank is entitled to judgment on its breach of contract claim for the deficiency remaining on the May 7, 2004 loan, pre- and post-judgment interest, and reasonable attorneys' fees. Whitney Bank is also entitled to judgment dismissing Horridge's counterclaims for fraud and tortious interference.

### A.   Conclusions of Law on the Fraud Claim

---

[1] To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact. To the extent any of the findings of fact is a conclusion of law, it should also be considered as a conclusion of law.

The elements of a fraudulent representation under Texas law are "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).  False representations contained in a contract can sound in tort as well as contract.  Under Texas law, "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Id.* at 46.  "[A] fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract." *Id.*  To prevail on a fraud claim, a plaintiff must demonstrate that he relied on a fraudulent misrepresentation to his detriment. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930-31 (Tex. 1983).

The merger clauses in the loan documents do not bar Whitney Bank's fraud claim based on the representations Horridge made in those documents as to the purpose of the loan, the condition of the collateral, and the absence of any investigation into the companies. However, the merger clauses in the Commercial Note, Loan Agreement, and guaranty preclude a fraud claim based on the misrepresentations related to the absence of prior bankruptcy in Horridge's financial statements previously provided to Whitney Bank.  *See Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997).

Horridge made fraudulent misrepresentations in the loan documents for the May 7, 2004 loan.  The representations that the purpose of the additional $1 million in loan proceeds

was to purchase Able Air Ambulance, that there was no pending investigation, and that the aircraft securing the loan had proper records and maintenance and complied with FAA airworthiness requirements were false.  Horridge knew that these representations were false in April and May 2004.  Horridge intended Whitney Bank to act on these representations. Whitney Bank reasonably relied on the representations in making the May 7, 2004 loan. Whitney Bank suffered financial loss as a result.  The damages proximately caused from reliance on the fraudulent representations are the $1 million new loan proceeds and the losses resulting from the renewal and extension of the prior outstanding loans.

Under Texas law, exemplary damages are recoverable when clear and convincing evidence shows that the harm is the result of fraud.  TEX. CIV. PRAC. & REM. CODE § 41.003(a) (Vernon 1997).  Texas law limits the amount of exemplary damages.  *Id.* at § 41.008(b).  In determining the amount of exemplary damages, the trier of fact considers: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the wrongdoer's degree of culpability; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant.  *Id.* at § 41.011(b); *see also Federal Nat'l. Mortg. Ass'n. v. Okeke*, 2006 WL 355241 (S.D. Tex., Feb. 14, 2006); *Wright v. Blythe-Nelson*, 2004 WL 1923871 (N.D. Tex., Aug. 26, 2004);  *Alamo Natl. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); *Huynh v. Phung*, 2007 WL 495023, at *10 (Tex. App.—Houston, Feb. 16, 2007);  *Long v. United Welding Supply, Inc*., 2006 WL 1428823, at *11, n.10 (Tex. App.—Houston, May 25, 2006, no pet.); *see generally Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308

(Tex. 2006) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). Considering all the factors, Whitney Bank is awarded $1 million in exemplary damages against Horridge.

### B.      Conclusions of Law on the Fraudulent Transfer Claim

The Texas Uniform Fraudulent Transfer Act states in relevant part as follows:

> Transfers Fraudulent as to Present and Future Creditors
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
> (b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>> (1) the transfer or obligation was to an insider;
>> (2) the debtor retained possession or control of the property transferred after the transfer;
>> (3) the transfer or obligation was concealed;
>> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>> (5) the transfer was of substantially all the debtor's assets;
>> (6) the debtor absconded;
>> (7) the debtor removed or concealed assets;
>> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>> (9) the debtor was insolvent or became insolvent shortly after the

transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS.& COMM. CODE § 24.005 (2003). The facts and circumstances considered in establishing fraudulent intent are nonexclusive "badges of fraud." *Chu v. Hong*, 185 S.W.3d 507, 512 (Tex. App.—Fort Worth 2005, pet. granted April 27, 2007). "When several of these 'badges of fraud' are present, a court may properly infer fraudulent intent." *Metal Bldg. Components, LP v. Raley*, 2007 WL 74316, at *6 (Tex. App.—Austin, Jan. 10, 2007).

The divorce decree does not preclude Whitney Bank's fraudulent transfer claim. *In re Erlewine*, 349 F.3d 205, 210 (5th Cir. 2003). A property division effected in a divorce decree is not a fraudulent transfer simply because it allocates less than half of the property to the spouse. *Id.* at 212–13.

The following asset transfers are fraudulent transfers:

• The $321,000 payment to BCAC from the Monte Cristo property sale.

• The $62,991.70 payment to Jacorro from the Monte Cristo property sale.

• The $276,366.22 payment to Jacorro from the Doubletree property sale.

• Horridge's backdated transfer of BCAC stock to Jacorro.

• Horridge's transfer of $100,988.01 to BCAC from his personal bank account.

The asset transfers set out above were made with the intent to hinder and delay collection by Whitney Bank, a creditor of Horridge. These transfers were made either just after Whitney Bank had made clear its intent to collect the debt or just after Whitney Bank

24

filed this suit. The transfers were of substantially all Horridge's nonexempt assets. Horridge was insolvent at the time of the transfers. The transfers removed assets from Whitney Bank's access. The payments to BCAC and the BCAC stock transfer to Jacorro were not for reasonably equivalent value.

## III.   Order

Under Texas law, "[t]here can be but one recovery for one injury, and the fact that . . . there may be more than one theory of liability[ ] does not modify this rule." *Tony Gullo*, 212 S.W.3d at 303. Although a plaintiff may bring actions based on both fraud and breach of contract, a court cannot award damages for the same injury for both fraud and breach of contract. *Id.* The plaintiff must chose a theory of recovery and is "entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict." *Id.* at 304.

Whitney Bank is ordered to submit a proposed final judgment consistent with the court's prior rulings and these findings of fact and conclusions of law by **June 15, 2007.** Horridge must respond by **June 29, 2007.**

SIGNED on June 4, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

25