**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK, | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-04-2220 |
| | § | |
| | § | |
| AIR AMBULANCE BY B&C FLIGHT | § | |
| MANAGEMENT, INC., *et al.,* | § | |

**MEMORANDUM AND OPINION SETTING OUT AMENDED FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

After a bench trial on May 21, 2007, this court issued a memorandum and order setting out findings of fact and conclusions of law and ordering the plaintiff, Whitney National Bank ("Whitney Bank"), to submit a proposed judgment. (Docket Entry No. 181). Whitney Bank filed a Motion to Amend or Add Findings of Fact and Conclusions of Law ("Motion to Amend"). (Docket Entry No. 183). In the Motion to Amend, Whitney Bank asked the court to include the entire amount of the unpaid loans that the defendant, Roy G. Horridge, guaranteed, in the damages resulting from Horridge's fraud. Horridge responded to Whitney Bank's Motion to Amend, arguing that Whitney Bank's fraud damages do not include the approximately $4.6 million in unpaid loans Horridge guaranteed in 2002 and 2003, but are limited to the additional $1 million loaned and guaranteed on May 7, 2004. (*See* Docket Entry No. 185).

This court held oral argument on the motion. Based on the motion and response, the record, the arguments of counsel, and the applicable law, this court grants Whitney Bank's

Motion to Amend.  As set out in detail below, the merger and survival clauses in the parties'
May 2004 contracts do not preclude Whitney Bank from recovering damages sustained as
a result of Horridge's fraudulent misrepresentations about his prior bankruptcy history made
in connection with applications he submitted to obtain the earlier loans.  This conclusion
leads to the amendment of some of the findings and conclusions in the Memorandum and
Opinion Setting Out Findings of Fact and Conclusions of Law and Ordering Submission of
Proposed Judgment ("Original Findings and Conclusions") (Docket Entry No. 181).  Other
than as amended, the findings and conclusions previously set out remain unchanged.

This court earlier found and concluded that Horridge made fraudulent
misrepresentations in connection with the May 7, 2004 loan and guaranty, with knowledge
that the representations were false, and with the intention that Whitney Bank rely on those
representations.  (Docket Entry No. 181 at 21–22).  This court also found and concluded that
Whitney Bank did in fact rely on those fraudulent misrepresentations in making the May 7,
2004 loan.  This court found and concluded that the actual damages proximately caused by
the Bank's reliance on the fraudulent representations were the $1 million in new loan
proceeds and the losses resulting from the renewal and extension of the prior loans.  (*Id.* at
22).  This court awarded Whitney Bank $1 million in exemplary damages against Horridge.
(*Id.* at 22–23).  These findings and conclusions remain in place.

The amended findings and conclusions set out in this Memorandum and Opinion
result in Horridge's liability for actual damages for fraud and for fraud in the inducement
relating to the loans that were made and guaranteed before 2004.  The actual damages total

2

the deficiency remaining on the loans, which amounts to $4,651,408.19 as of February 2, 2007, plus $620.19 per day from February 2, 2007 until judgment.  The reasons for the amended findings and conclusions are set out below.

## I.      Factual Background Relevant to the Amended Findings and Conclusions

As set out in detail in this court's Memorandum and Opinion entered at Docket Entry No. 181, Whitney Bank made several loans to Air Ambulance by B&C Flight Management, a company formed, owned, and operated by Horridge.  The first loan, executed on March 19, 2002, was in the amount of $1,453,519.31.  (*See* Docket Entry No. 181 at 4 (citing Plaintiff's Exs. 24–27)).  The second loan, executed on November 20, 2002, was in the additional amount of $2,100,000.  (*See id.* (citing Plaintiff's Exs. 28–32)).  The third loan, executed on May 21, 2003, was in the additional amount of $1,250,000.  (*Id.* at 5 (citing Plaintiff's Exs. 34–37)).  The fourth loan, executed on July 25, 2003, was in the additional amount of $1,325,000.  (*See id.* (citing Plaintiff's Exs. 40–43)).  The final loan, executed on May 7, 2004, renewed, consolidated, and extended the existing debt and added $1 million in new loan proceeds.  (*See* Plaintiff's Ex. 63).  The documents related to the May 7, 2004 loan included a Commercial Note dated May 7, 2004 ("Commercial Note") (Plaintiff's Ex. 63), a First Amended and Restated Commercial Business Loan Agreement ("Amended Loan Agreement") (Plaintiff's Ex. 64), a (Restated) Continuing Guaranty ("Restated Guaranty") (Plaintiff's Ex. 65), and a Ratification of Previously Executed Security Agreements ("Ratification") (Plaintiff's Ex. 66).  In addition, five Aircraft Security Agreements, two dated November 20, 2002 and the others dated March 19, 2002, May 21, 2003, and July 25,

3

2003, were also associated with the May 7, 2004 loan.  (*See* Docket Entry No. 181 at 5).  In addition to the Continuing Guaranty that Horridge executed in connection with the final May 7, 2004 loan, Horridge had also previously executed continuing guaranties in connection with each of the previous loans.  These guaranties included a Continuing Guaranty executed March 19, 2002 in connection with the March 19, 2002 loan, (Plaintiff's Ex. 26); a Continuing Guaranty executed November 20, 2002 in connection with the November 20, 2002 loan, (Plaintiff's Ex. 30); a Continuing Guaranty executed May 21, 2003 in connection with the May 21, 2003 loan, (Plaintiff's Ex. 36); and a Continuing Guaranty executed July 25, 2003 in connection with the July 25, 2003 loan, (Plaintiff's Ex. 43).

The Commercial Note associated with the May 7, 2004 loan contained a merger clause stating:

> THIS NOTE AND *ALL OTHER LOAN DOCUMENTS* EMBODY THE FINAL, ENTIRE AGREEMENT . . . AND SUPERCEDE[] ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY ANY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR A SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF MAKER AND BANK. THERE ARE NO ORAL AGREEMENTS BETWEEN THE MAKER AND BANK.

(Plaintiff's Ex. 63 at 4 (capitalization in original) (emphasis added)).  The Amended Loan Agreement associated with the May 7, 2004 loan incorporated the Commercial Note (*see* Plaintiff's Ex. 64 at 1), and contained a similar merger clause stating, "THIS AGREEMENT,

THE NOTE, *AND THE OTHER LOAN DOCUMENTS* REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS . . . ."   (Plaintiff's Ex. 64 at 6 (capitalization in original) (emphasis added)).   Later in the Amended Loan Agreement, there is another statement that "*THE LOAN DOCUMENTS* REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES . . . ."   (*Id.* at 7 (capitalization in original) (emphasis added)).   The Restated Guaranty associated with the May 7, 2004 loan also contained a merger clause, stating, "THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF THE GUARANTOR AND BANK WITH RESPECT TO GUARANTOR'S GUARANTY OF THE OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, WITH RESPECT TO THE SUBJECT MATTER HEREOF."   (Plaintiff's Ex. 65 at 4 (capitalization in original)).

The Amended Loan Agreement associated with the May 7, 2004 loan also contained a survival clause, stating:

> All representations and warranties made in this Agreement or *any other Loan Document* or in any document, statement, or certificate furnished in connection with this Agreement shall survive the execution and delivery of this Agreement and the *other Loan Documents* and repayment of the Borrower's obligations to the Bank, and no investigation by the Bank or any closing shall affect the representations and warranties or the right of the Bank to rely upon them.

(Plaintiff's Ex. 64 at 6 (emphasis added)).

The term "Loan Documents," referred to in the merger and survival clauses of the Amended Loan Agreement and in the merger clause of the Commercial Note, is defined as "this [Amended Loan] Agreement, any other loan agreement(s), the promissory note(s) evidencing the Loan, any continuing guaranty(ies) by Obligor, any security document(s) provided for in this Agreement, and any and all other documents by Borrower or any Obligor evidencing or securing the obligations of Borrower to Bank, direct or contingent, due or to become due, now existing or hereafter arising."  (Plaintiff's Ex. 64 at 1).

This court previously held that the merger clauses were inconsistent with Whitney Bank's argument that it could assert fraud and fraud in the inducement not only as to the May 7, 2004 $1 million loan, but also as to the earlier loans that were renewed and extended in May 2004.  (*See* Docket Entry No. 181 at 13).  Whitney Bank contends that the merger clauses do not preclude Whitney Bank from relying on misrepresentations Horridge made in connection with obtaining the earlier loans.  (*See* Docket Entry No. 183 at 5).

## II.    The Legal Standard Applicable to Merger and Survival Clauses

In *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156 (Tex. 1995), the Texas Supreme Court identified instances in which a disclaimer-of-reliance clause in a contract would not be enforceable.  In that case, Prudential asserted that the other party to the contract at issue could not assert damages for alleged misrepresentations.  The contract related to the purchase of a building "as is."  The alleged misrepresentations concerned the building's condition.  *Prudential*, 896 S.W.2d at 159.  The court held that "[b]y agreeing to

6

purchase something 'as is,' a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong." *Id.* at 161 (citing *Mid Continent Aircraft Corp. v. Curry County Spraying Serv. Inc.*, 572 S.W.2d 308, 313 (Tex. 1978)). The *Prudential* court stated that there were circumstances in which a buyer would not be bound by an agreement to purchase something "as is," including: (1) if the buyer was induced to buy something "as is" based on a fraudulent misrepresentation; or (2) if the buyer is entitled to inspect the condition of what is being sold, but is hindered by the seller from making a full inspection. *Id.* at 162. The court noted that other aspects of a transaction could make an "as is" agreement unenforceable. "The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered." *Id.* "Where an 'as is' clause is an important part of the basis of the bargain, not an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect." *Id.*

In *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), the Texas Supreme Court narrowed the fraudulent-inducement exception to enforcing "as is" clauses. The court emphasized that parties may disclaim reliance on representations and that "such a disclaimer, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim." *Schlumberger*, 959 S.W.2d at 179. The court held that "[t]he contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding." *Id.* The *Schlumberger* court found the disclaimer-of-reliance clause

7

in the release at issue in that case was enforceable, primarily "[b]ecause the parties were attempting to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project . . . ." *Id.* at 180.  By including a disclaimer-of-reliance clause in the release, the parties contemplated that the buyer would not rely on the seller's representations as to the commercial feasibility and value of the project because that was "the very dispute that the release was supposed to resolve." *Id.*  The court also emphasized that the parties were both sophisticated, represented by competent legal counsel, and dealing with each other at arm's length.  *Id.*  After reaching its conclusion that the disclaimer-of- reliance clause was enforceable, the *Schlumberger* court stated:  "We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim."  *Id.* at 181 (citing *Prudential*, 896 S.W.2d at 162).  The *Schlumberger* court found the disclaimer-of-reliance provision enforceable under the facts of that case, but did not eliminate the fraudulent-inducement exception to enforcing disclaimers of reliance.

Whitney Bank cites *Warehouse Assocs. Corporate Centre II, Inc. v. Celotex Corp.*, 192 S.W.3d 225 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), a recent case analyzing the effect of *Schlumberger* on the *Prudential* analysis. (Docket Entry No. 183 at 6–7).  In *Warehouse Assocs.*, the court first noted that *Prudential* had established fraudulent-inducement and impairment-of-inspection exceptions to the enforceability of as-is and waiver-of-reliance clauses.  *See Warehouse Assocs.*, 192 S.W.3d at 230–31 (citing *Prudential*, 156 S.W.2d at 160–62).  The *Warehouse Assocs.* court explained that the

8

*Schlumberger* court's analysis showed that these two exceptions to *Prudential* remain valid,[1] subject to the carve-out established in *Schlumberger*.  *Id.* at 231.  The *Warehouse Assocs.* court also noted that the decisive factor in *Schlumberger* was the fact that the contracting parties' mutual intent was to resolve a long-standing dispute and the parties disclaimed reliance on representations relating to that dispute.  *Id.* at 234.

The *Warehouse Assocs.* court found that *Schlumberger* had established that the *Prudential* fraudulent-inducement exception to the enforceability of a waiver-of-reliance clause does not apply to waiver-of-reliance language "(1) that clearly and unequivocally disclaims reliance on the specific representations that are the basis of the claims in question, (2) in a contract whose purpose is to definitively end a dispute in which the contracting parties have been embroiled, (3) in an arm's length transaction between sophisticated parties represented by counsel."  192 S.W.3d at 234 (citing *Schlumberger*, 959 S.W.2d at 179–81).[2] The court concluded that because the purpose of the contract at issue was not to end a dispute

---

[1]        In addition to the two main exceptions to the enforceability of waiver-of-reliance or merger clauses, the *Warehouse Assocs.* court noted that *Prudential* had also established that such clauses could be unenforceable in other instances as well, based on such factors as the parties' sophistication, whether the transaction was made at arm's length, the relative bargaining power of the parties, and whether the language was important to the negotiation or simply "boilerplate."  *Warehouse Assocs.*, 192 S.W.3d at 230 n.4.

[2]        The *Schlumberger* court implied that the same analysis would apply whether the clause at issue is a "merger clause," a "disclaimer-of-reliance clause," or an "as-is clause" because the court used those terms interchangeably.  *See Schlumberger*, 959 S.W.2d at 181 ("In sum, we hold that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement.  We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim." (citing *Prudential*, 896 S.W.2d at 162 ("identifying some circumstances in which an 'as is' clause would not preclude fraudulent inducement claim"))).

between the parties, it did not fall within *Schlumberger* and the exceptions from *Prudential* could apply.  *Id.*

## III.   Application of the Law to the Merger Clauses at Issue

Whitney Bank asserts that the line of cases discussed above establishes that the merger clauses in the loan and guaranty contracts at issue do not preclude the court from finding and concluding that Horridge is liable for fraudulent misrepresentations he made in the financial statements he submitted in connection with the loans and guaranties executed before May 2004.  (Docket Entry No. 183 at 6–7).  Based on a careful review of the case law and the relevant contractual provisions, this court agrees.  The merger clauses in the 2004 loan and guaranty contracts do not preclude Whitney Bank from asserting fraud and fraud in the inducement in the 2002 and 2003 loans, based on misrepresentations contained in the financial statements Horridge submitted in connection with those loans and guaranties.

The Amended Loan Agreement executed in May 2004 contains both a survival clause and a merger clause.  The merger clause states that the Amended Loan Agreement, the Commercial Note, and the other "Loan Documents" referred to in the Amended Loan Agreement are the final, entire agreement and supersede previous agreements and representations.  (Plaintiff's Ex. 64 at 6).  "Loan Documents" is defined earlier in the Amended Loan Agreement to include: "the [Amended Loan] Agreement, *any other loan agreement(s)*, the promissory note(s) evidencing the Loan, any continuing guaranty(ies) by Obligor, any security document(s) provided for in this Agreement, and any and all other documents by Borrower or any Obligor evidencing or securing the obligations of Borrower

10

to Bank, direct or contingent, due or to become due, now existing or hereafter arising." (*Id.* at 1 (emphasis added)).  By its terms, the merger clause does not preclude reliance on representations contained in previous loan agreements and related documents.  Indeed, the survival clause located immediately above the merger clause states that representations or warranties made in other "Loan Documents" (which, by definition, includes other "Loan Agreements") will survive the execution of the Amended Loan Agreement.  (*Id.* at 6).

Because the survival clause and the merger clause in the May 2004 Amended Loan Agreement permit representations in prior "Loan Documents" between the same parties to survive, the previous Loan Documents in this case must be examined to determine whether representations made in connection with them survive.  In the March 19, 2002 Loan Agreement, under the section labeled "Representations, Warranties, and Covenants," there is a requirement that the Borrower submit certain financial information.  (Plaintiff's Ex. 25 at 2).  That agreement defines "Borrower" as Medical Express International, Inc.  (*Id.* at 1).  However, the agreement also states that "Borrower and Guarantor, if any, and any other person who may be liable now or in the future for any portion of any Loan are referred to as 'Borrower', which term means individually, collectively, and interchangeably any, each and/or all of them."  (*Id.*).  Despite the inclusive nature of the term "Borrower," the requirement that the Borrower submit financial statements does not clearly apply to Horridge because it requires "Borrower (other than an individual)" to provide financial statements, (*id.* at 2), and Horridge guaranteed the loans in his individual capacity.  However, that same section in the March 19, 2002 Loan Agreement also has the following requirement:

"Annually, within one hundred twenty (120) days after the close of the calendar year the Guarantor shall deliver to the Bank a financial statement in form acceptable to the Bank." (*Id.*). Thus, as Guarantor, Horridge was expressly required to submit financial statements. This requirement continued in the amendments to this initial Loan Agreement. (*See, e.g.*, Plaintiff's Ex. 29 at 5 (stating that the terms of the March 19, 2002 agreement are ratified and confirmed, except as expressly modified by the amendment)). The Continuing Guaranty dated March 19, 2002, signed by Roy G. Horridge as Guarantor, also requires the Guarantor to provide Whitney Bank with financial statements of the Guarantor for each fiscal year beginning with the year ended December 31, 2001, as well as additional information concerning Guarantor that Bank may reasonably request. (Plaintiff's Ex. 26 at 2). The subsequent guaranties confirmed the Guarantor's duty to provide financial statements. (*See* Plaintiff's Ex. 30 at 2 (requiring Guarantor to furnish financial statements for each fiscal year, beginning with the fiscal year ending December 31, 2002); Plaintiff's Ex. 36 at 2 (requiring Guarantor to furnish financial statements for each fiscal year, beginning with the fiscal year ending 2003); Plaintiff's Ex. 43 at 2 (requiring Guarantor to furnish financial statements for each fiscal year, beginning with the fiscal year ending 2003)). As Guarantor, Horridge had a continuing duty to submit financial information in connection with the March 19, 2002 Loan Agreement and subsequent amendments, the March 19, 2002 Continuing Guaranty, and the later Continuing Guaranties that Horridge executed.

The representations included in the financial statements that Horridge submitted in connection with the March 19, 2002 Loan Agreement and the March 19, 2002 Continuing

Guaranty are included in the representations that survived those contracts.  The March 19,

2002 Loan Agreement contains a survival clause, which states:

> *All representations and warranties* made in this Agreement or
> any other Loan Document or *in any document, statement, or
> certificate furnished in connection with this Agreement shall
> survive* the execution and delivery of this Agreement and the
> other Loan Documents and repayment of the obligation to the
> Bank, and no investigation by the Bank or any closing shall
> affect the representations and warranties or the right of the Bank
> to rely upon them.

(Plaintiff's Ex. 25 at 6 (emphasis added)).  Similarly, the representations Horridge made in

the financial statements submitted in connection with the November 20, 2002  First

Amendment to Commercial Business Loan Agreement for Term Loans ("First Amendment"),

(Plaintiff's Ex. 29), are included in the representations covered by the survival clause.  The

First Amendment contained a survival clause stating:

> All representations and warranties made in this Amendment or
> any other Loan Document including any Loan Document
> furnished in connection with this Amendment shall survive the
> execution and delivery of this Amendment and the other Loan
> Documents, and no investigation by Lender or any closing shall
> affect the representations and warranties or the right of the
> Lender to rely upon them.

(*Id.* at 5).  The Second Amendment to Commercial Business Loan Agreement for Term

Loans, executed in connection with the third loan, dated May 21, 2003, contains an identical

survival clause to the one in the First Amendment.  (Plaintiff's Ex. 35 at 5).  Finally, the

Third Amendment to Commercial Business Loan Agreement for Term Loans, executed in

connection with the fourth loan, dated July 25, 2003, also contains a survival clause identical to the one in the First Amendment.  (Plaintiff's Ex. 42 at 6).

The representations made in the financial statements submitted in connection with the March 19, 2002 Loan Agreement and Continuing Guaranty are in documents associated with the March 19, 2002 Loan Agreement and covered by the survival clause in that agreement. The subsequent survival clauses in the amendments to that original Loan Agreement indicate that other Loan Documents (and, by definition, other Loan Agreements) survive the execution of the subsequent amendments.  Because any financial statements submitted in connection with the March 19, 2002 Loan Agreement survive that agreement by way of the survival clause in that Loan Agreement, they also survive the subsequent amendments to that agreement by way of the survival clauses in those subsequent amendments incorporating the prior loan agreements.

The amendments to the March 19, 2002 Loan Agreement also contain ratification clauses stating that "the terms and provisions of the [March 19, 2002 Loan] Agreement are ratified and confirmed and shall continue in full force and effect."  (Plaintiff's Ex. 29 at 5; Plaintiff's Ex. 35 at 5; Plaintiff's Ex. 42 at 5).  The amendments to the Loan Agreement also contain a provision stating that Borrower and Guarantor represent and warrant that "the representations and warranties contained in the [March 19, 2002 Loan] Agreement, as amended hereby, and any other Loan Document are true and correct on and as of the date hereof as though made on and as of the date hereof."  (Plaintiff's Ex. 29 at 5; Plaintiff's Ex. 35 at 5; Plaintiff's Ex. 42 at 6).

The merger clause in the May 7, 2004 loan agreement, which renewed, extended, and consolidated the earlier loans and added $1 million in new loan proceeds, does not preclude reliance on financial statements Horridge submitted in connection with the earlier loans he obtained for Air Ambulance and personally guaranteed.  The survival of representations Horridge made in financial statements he submitted to obtain the earlier loans is further bolstered by the fact that the Commercial Note associated with the May 7, 2004 loan is "a renewal, extension, increase, and rearrangement, *but not a novation*, of those certain promissory notes left due and owning by the Borrower . . . ."  (Plaintiff's Ex. 63 at 3 (emphasis added)).  The fact that the May 2004 loan renewed, consolidated, and extended the 2002 and 2003 loans, but was "not a novation," further indicates that the parties did not intend the last loan and guaranty to replace the earlier loans and guaranties or stand in isolation separate from them.  To the contrary, the parties clearly agreed that the May 2004 loan renewed, consolidated, and extended the original loans as well as added $1 million in new loan proceeds.  Contrary to Horridge's assertion, the merger clause and survival clause in the May 2004 loan agreement and guaranty do not create an ambiguity.  Rather, the merger clause precludes reliance on representations made outside the documents connected with any of the related loans and guaranties, and the survival clause allows representations made in connection with the earlier loans and guaranties to survive the execution of the May 2004 loan agreement and guaranty.  Considering the language of the loan agreements and related documents in their totality leads to the conclusion that in renewing and extending the earlier four loans and related guaranties, the parties did not intend to disclaim reliance on

15

representations made in connection with those loans and guaranties that survived the execution of those loans and guaranties.

There is another ground that supports allowing Whitney Bank to show that it relied on Horridge's representations made in connection with the earlier loans. Subject to the exceptions described in *Schlumberger*, a merger clause in a contract will not preclude reliance on previous misrepresentations if the contract was fraudulently induced. *See Schlumberger*, 959 S.W.2d at 179. As explained by the *Warehouse Assocs.* court, the fraudulent-inducement exception will not apply if: (1) there is clear, unequivocal disclaimer of reliance on the specific representations that are the basis for the claims in question; (2) the contract's purpose is to definitively end a dispute between the parties that is the subject of the representations; and (3) the parties were sophisticated and negotiated at arm's length. 192 S.W.3d at 234 (citing *Schlumberger*, 959 S.W.2d at 179–81). The elements that the *Warehouse Assocs.* and *Schlumberger* courts identified as barring the fraudulent-inducement exception to the enforceability of a merger clause or disclaimer-of-reliance clause are not present in this case. Whitney Bank alleged and provided testimony showing that it reasonably relied on Horridge's false representations as to the absence of any bankruptcy history. None of the merger clauses disclaim reliance on Horridge's representations about his financial history and condition, including the absence of prior bankruptcies. To the contrary, these representations are included in the contractual survival clauses. The merger clauses do not specifically disclaim reliance on representations made in documents associated with the renewed and extended loans and guaranties. The parties did not disclaim reliance

16

on representations made in connection with the earlier renewed and extended loans and guaranties.

Unlike *Schlumberger*, neither the 2004 Loan Agreement nor its merger clause was intended to end a dispute between the contracting parties.  In *Schlumberger*, the parties were trying to conclude a transaction that had been threatened by a dispute as to the feasibility and value of the project.  959 S.W.2d at 180.  Here, in contrast, the Loan Agreements and related guaranties were intended to provide money to Air Ambulance by B&C Flight Management, the company Horridge owned and operated.  There is no evidence that the Loan Agreements were intended to end any long-standing dispute between the parties.  The merger clause does not specifically disclaim reliance on statements made in the earlier Loan Agreements and related documents.  The second element discussed in *Schlumberger* and *Warehouse Assocs.* for barring a fraudulent misrepresentation claim is not met.

This court previously found that the merger clauses would only "preclude a fraud claim based on prior oral or written representations related to but extrinsic to the loan agreements, which varied or contradicted those agreements." (Docket Entry No. 165 at 27). As Whitney Bank points out, the representations made before the May 2004 loan and guaranty, about the lack of Horridge's bankruptcy history, do not vary or contradict statements in the May 2004 Amended Loan Agreement (and associated documents), which do not address Horridge's prior bankruptcy experience.  Nor do any of the Loan Agreements or Guaranties state that Whitney Bank would take on the responsibility of investigating whether Horridge, the guarantor, had previously filed for bankruptcy.  *See Escopeta Oil &*

17

*Gas Corp. v. Songa Mgmt., Inc.*, No. 1:06-cv-386, 2007 WL 171721, at *9 (E.D. Tex. Jan. 17, 2007) (finding that silence in the contract as to a particularly important issue weighed against concluding that the defendant could not be liable for misrepresentations made before the contract's execution, despite the merger clause); *cf. Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003) (enforcing a disclaimer-of-reliance provision after finding that it was clear that there was no reliance on a particular representation in part because the contract stated that the party asserting fraud had the sole right to make its own determination on the issue).

This court concludes that the merger clauses in the relevant documents would not bar a fraud or fraudulent-inducement claim based on Horridge's misrepresentations about the absence of any bankruptcy history, which were made in connection with obtaining the earlier loans and which survived the execution of those loan agreements. This conclusion does not depend on an insistence that the factual pattern from *Schlumberger* must be matched to enforce a merger clause in the face of a fraud claim. *See Steinberg v. Brennan*, No. 3:03-cv-0562, 2005 WL 1837961, at *5 (N.D. Tex. July 29, 2005) ("The Fifth Circuit has routinely enforced disclaimers of reliance on the basis of contractually evident intent, without requiring the particular constellation of facts that appear in *Schlumberger.*"). In *Steinberg*, the court reviewed decisions interpreting *Schlumberger* in the context of merger or as-is clauses and noted that several cases had found that such clauses were enforceable based on the clear intent of the parties, without necessarily evaluating all the factors at issue in *Schlumberger*, such as whether the clause had been drafted to end a dispute or contemplated a particular

18

transaction.  *Id.* at *4–5.  Nonetheless, *Steinberg* emphasized that a court must consider the totality of the circumstances in deciding whether a merger or disclaimer-of-reliance clause will be enforced.  *See id.* at *5 (noting that "idiosyncratic drafting and other characteristic facts of *Schlumberger* are not prerequisite for a finding of clear and unequivocal intent under that case," and that such intent can be gleaned from evaluating the totality of the circumstances).  The conclusion that the merger clauses do not preclude a fraud claim based on Horridge's earlier misrepresentations about his history in the bankruptcy courts is not based on the lack of exact symmetry with the factual pattern in *Schlumberger*.  Instead, the totality of the circumstances, including reading the merger clauses and the survival clauses in all the relevant documents and taking into account the fact that the May 7, 2004 loan extended and renewed the earlier loans and guaranties, points to the conclusion that the parties did not intend to preclude Whitney Bank's reliance on Horridge's misrepresentations made in connection with the earlier loans that survived the execution of those loans.  The totality of the circumstances surrounding the loan agreements and guaranties establishes that the elements necessary to bar a fraudulent-inducement claim based on the merger clauses are not met in this case.  As a result, Whitney Bank is not precluded from asserting fraudulent inducement based on alleged misrepresentations regarding Horridge's bankruptcy filings made in documents associated with the earlier loan agreements and guaranties.

This analysis does not detract from the findings and conclusions that Horridge committed fraud in inducing Whitney Bank to loan Air Ambulance $1 million in "new" money in 2004.  This analysis does affect the findings and conclusions relating to whether

Horridge committed fraud in inducing Whitney Bank to loan Air Ambulance more than $4.5 million in 2002 and 2003.  As set out below, Horridge committed fraud with respect to the entire loan from Whitney Bank to Air Ambulance.

## IV.    Amended Findings of Fact

In view of the above discussion that the merger clauses do not preclude Whitney Bank from relying on Horridge's representations in financial statements he submitted to obtain the earlier loans, some of the findings and conclusions entered in Docket Entry No. 181 must be amended.  The findings of fact set forth in this court's Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law and Ordering Submission of Proposed Judgment (Docket Entry No. 181) remain unchanged except as specifically stated below.

### A.    Amended Findings of Fact as to Horridge's Misrepresentations About His Bankruptcy History

In 1987, a judgment was entered against Jillie Jacorro ("Jacorro"), Horridge, and one of Horridge's previous companies, Twin City Leasing Corporation, for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962; securities fraud, 15 U.S.C. § 78(b); statutory fraud, TEX. BUS. & COMM. CODE § 27.01; common law fraud; civil conspiracy to defraud; and breach of the obligation of good faith under Section 1.203 of the Texas Uniform Commercial Code.  (Plaintiff's Ex. 4).  Horridge voluntarily filed bankruptcy on behalf of Twin City Leasing Corporation to prevent the entry of judgment against that company.  (*See* Plaintiff's Exs. 5, 6).  Horridge and Jacorro voluntarily filed personal bankruptcy in 1988 to prevent the execution of the judgment that had been executed against

them.  (*See* Plaintiff's Ex. 7).  These bankruptcy actions were later voluntarily dismissed.

To obtain the loans from Whitney Bank to Air Ambulance, Horridge executed personal guaranties and provided Whitney Bank documents containing personal financial information dated November 30, 2000, October 1, 2001, April 28, 2003, February 10, 2004, and February 18, 2004.  (Plaintiff's Exs. 20, 21, 33, 49, and 50).  In most of these documents, Horridge answered questions asking for information about previous bankruptcies.  Horridge failed to disclose the previous bankruptcies in answering those questions.  Horridge argues that the only financial statement on which Whitney Bank relied in issuing the May 2004 loan and guaranty was submitted in February 2004 and that this financial statement did not contain a misrepresentation about Horridge's bankruptcy history because the relevant question in that financial statement only asked if he had been "declared bankrupt."  (Docket Entry No. 185 at 3).  Horridge asserts that his personal bankruptcy proceeding was voluntarily dismissed in 1992 and that his answer to the question in the February 2004 financial statement was factually accurate.  (*Id.*).  Both aspects of Horridge's argument are unconvincing.  First, Whitney Bank is not precluded from showing that it relied on the information Horridge provided in the financial statements that he submitted in applying for the 2002 and 2003 loans as well as the 2004 loan.  Second, Whitney Bank has shown that Horridge failed to disclose his previous bankruptcy filings in response to questions in four other financial statements he was required to, and did, provide in connection with the loans he obtained for Air Ambulance.  Third, the answer to the question in the 2004 financial statement was not factually accurate.

21

Horridge clearly misrepresented his bankruptcy history in the November 30, 2000 financial statement that he provided in seeking the first loan Air Ambulance obtained from Whitney Bank. In that financial statement, Horridge responded to the question: "Have you or your spouse ever been the subject of bankruptcy proceedings?" Horridge answered "No," despite the undisputed fact that he and his spouse had previously voluntarily filed for personal bankruptcy. (Plaintiff's Ex. 20). This was a misrepresentation on which Whitney Bank reasonably and foreseeably relied in deciding to loan Air Ambulance $1,453,519.31 in March 2002; an additional $2,100,000 in November 2002; an additional $1,250,000 in May 2003; an additional $1,325,000 in July 2003; an additional $1 million in May 2004; and in renewing, consolidating, and extending the existing debt in May 2004.

In financial statements dated October 1, 2001 and April 28, 2003, Horridge left blank the answer to the following question: "Have you ever made a composition settlement or taken bankruptcy? If yes, Explain." (Plaintiff's Exs. 21, 33). Horridge had taken bankruptcy and neither disclosed nor explained it. His answer was false. In financial statements dated February 10, 2004 and February 18, 2004, Horridge answered "No" in response to questions asking whether he had been "declared bankrupt." (Plaintiff's Exs. 49, 50). Again, this answer was false and Horridge knew it was false. Horridge's argument that there is a difference between voluntarily filing a bankruptcy petition and being "declared" bankrupt is without support. It was reasonable for Whitney Bank to consider Horridge's answers to these questions with the information he had previously given that he had not been the "subject of bankruptcy proceedings" and had not "taken bankruptcy."

Horridge's answers to the questions about bankruptcy in each of these financial statements constituted a misrepresentation of a material fact, either by affirmative misstatement or by omission. *See Schlumberger*, 959 S.W.2d at 181 ("Fraud by non-disclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts." (citing *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979))).  This court finds that Horridge knowingly misrepresented his previous bankruptcy history in the financial statements submitted in connection with the loans he obtained on behalf of Air Ambulance in 2002 and 2003.  This court finds that Horridge made the misrepresentations as to the absence of any prior bankruptcy history with the intent that Whitney Bank rely on these misrepresentations in deciding whether to loan Air Ambulance the money Horridge sought. This court further finds that Whitney Bank reasonably relied on the misrepresentations as to the absence of Horridge's bankruptcy history in deciding to loan Air Ambulance the initial $1,453,519.31 in March 2002 and the subsequent amounts in November 2002, May 2003, and July 2003, which totaled more than $4.5 million in April 2004, as well as the additional $1 million in May 2004.  Specifically, this court finds that had Horridge disclosed the prior bankruptcy, Whitney Bank would have investigated and learned that Horridge and a company he owned and controlled had been sued for fraud and RICO violations; that an adverse judgment had been entered; and that Horridge had filed bankruptcy to avoid having to pay that judgment.

Horridge argues that disclosing the information about the prior bankruptcy would not have changed Whitney Bank's decision to issue the loans because an investigation would have revealed that the original judgment was settled.  But Whitney Bank has presented credible evidence that based on the information about Horridge and the way in which he did business that Whitney Bank would have discovered through investigating his prior bankruptcy and the related litigation, the Bank would not have agreed to make the 2002 and 2003 loans or to enter into the May 2004 agreement renewing, extending, and consolidating those loans as well as adding new loan proceeds.  The investigation would have revealed information about the fraud judgment against Horridge and a company he owned and controlled and would have led to Whitney Bank's refusal to make the original loan in 2002 and the subsequent loans.  Whitney Bank has presented credible evidence that it reasonably relied on Horridge's misrepresentations as to the absence of any bankruptcy history, to its detriment.

### B.      Amended Findings of Fact Regarding Damages for Fraud

This court has previously found that the evidence shows that Whitney Bank's damages proximately caused by the fraudulent representations Horridge intentionally made to induce Whitney Bank to enter into the May 7, 2004 loan are the $1 million in new loan proceeds as well as damages from the renewal and extension of the outstanding loans. (Docket Entry No. 181 at 15–16).  The misrepresentations that this court earlier found induced Whitney Bank to enter into the May 2004 loan were the misrepresentations about the purpose of the $1 million additional loan, the misrepresentation as to the absence of any

24

investigation, and the misrepresentation that the aircraft complied with FAA requirements. This court has now found that in addition to these misrepresentations made in 2004 to induce Whitney Bank to enter into the May 2004 loan and guaranty, Horridge made misrepresentations about the lack of any bankruptcy history that induced Whitney Bank to enter into the 2002 and 2003 loans and guaranties. As a result, the actual damages resulting from Horridge's fraud extend to the full loan deficiency amount, not merely the $1 million in new loan proceeds added in 2004. Whitney Bank asserts that the actual damages from Horridge's fraudulent misrepresentations include the full amount of the loans less the amounts recovered by Whitney Bank in the foreclosure sale. (Docket Entry No. 183 at 2). Horridge has asserted that Whitney Bank's fraud damages are limited to the $1 million in new loan proceeds added on May 7, 2004. (Docket Entry No. 185 at 2).

Whitney Bank has established that it is entitled to a deficiency judgment in the amount of $4,651,408.19 as of February 2, 2007, plus $620.19 per day from February 2, 2007 until the date of judgment. (Docket Entry No. 181 at 15; Plaintiff's Ex. 152). This court agrees that the damages proximately caused by Horridge's fraud equal the full amount of the deficiency judgment. In addition to the findings that Horridge fraudulently induced Whitney Bank to make the May 2004 loan by misrepresenting the status of Air Ambulance's aircraft and FAA regulatory compliance, this court also finds that Whitney Bank was fraudulently induced to make the 2002 and 2003 loans by Horridge's misrepresentations as to the absence of any bankruptcy history. The merger clauses do not preclude Whitney Bank from relying on Horridge's misrepresentations in his financial statements submitted in connection with

25

obtaining the 2002 and 2003 loans, as well as the misrepresentations he made in connection

with obtaining the 2004 loan.  The actual damages proximately caused by Horridge's fraud

are in the amount of $4,651,408.19 as of February 2, 2007, plus $620.19 per day from

February 2, 2007 until the date of judgment.

The findings of fact set forth in the Original Findings and Conclusions, (Docket Entry

No. 181), remain unchanged by the foregoing analysis with respect to the following sections

in that Memorandum and Opinion:

- The Parties.  (Docket Entry No. 181 at 3–4).

- The 2004 Loan from Whitney Bank. (*Id.* at 4–6 (describing the history of the loans from Whitney Bank to Air Ambulance)).

- The Misrepresentation as to the Purpose of the $1 Million Additional Loan. (*Id.* at 7–8).

- The Misrepresentation as to the Absence of Any Investigation.  (*Id.* at 8–11 (describing Horridge's failure to disclose the FAA investigation)).

- The Misrepresentation that the Aircraft Complied with FAA Requirements. (*Id.* at 11–12).

- The FAA's Suspension and Revocation, Whitney Bank's Notice of Default and Acceleration, and the Sale of the Collateral.  (*Id.* at 13–16 (except to the extent that the damages proximately caused by the fraudulent representations have been amended by this opinion)).

- The Fraudulent Transfer Claim.  (Docket Entry No. 181 at 16–20).

## V.    Amended Conclusions of Law[3]

The elements of fraudulent misrepresentation under Texas law are "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (internal quotations and citations omitted). Under Texas law, "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Id.* at 46.   To prevail on a fraud claim, a plaintiff must demonstrate that he relied on a fraudulent misrepresentation to his detriment. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).   The Fifth Circuit recently explained that a finding of fraud requires proof of actual reliance, not just proof that it would have been reasonable to rely on the misrepresentation. *See Allstate Ins. Co. v. Receivable Fin. Co. LLC*, No. 05-10265, 2007 WL 2729468, at *6 (5th Cir. Sept. 20, 2007) ("Whether reliance . . . would have been reasonable, however, is a distinct inquiry from whether reliance existed at all.").

The merger clauses contained in the Commercial Note, Loan Agreement, and Restated Guaranty associated with the May 7, 2004 loan do not preclude a fraud claim based on misrepresentations in the financial statements Horridge previously provided to Whitney Bank relating to the absence of prior bankruptcies. *See Warehouse Assocs.*, 192 S.W.3d at 234

---

[3]    To the extent any of the conclusions of law are findings of fact, they should be considered findings of fact.   To the extent any of the findings of fact are conclusions of law, they should also be considered conclusions of law.

(citing *Schlumberger*, 959 S.W.2d at 179–81) (discussing the circumstances in which a disclaimer of reliance might not be enforceable in the face of a claim that the contract was fraudulently procured).

Horridge made fraudulent misrepresentations in the financial statements that he submitted in connection with the 2002 and 2003 loans he obtained for Air Ambulance from Whitney Bank. Specifically, Horridge failed to disclose his previous bankruptcy filings in the financial statements he submitted dated November 30, 2000, October 1, 2002, April 28, 2003, February 10, 2004, and February 18, 2004. Those financial statements contained questions that called for this information. (Plaintiff's Exs. 20, 21, 33, 49, and 50). The first financial statement specifically asked, "Have you or your spouse ever been the subject of bankruptcy proceedings?" (Plaintiff's Ex. 20). Horridge and his spouse had previously filed for bankruptcy. Horridge filed bankruptcy on behalf of Twin City Leasing Corporation to prevent collection on a 1987 judgment entered against Jacorro, Horridge, and Twin City Leasing Corporation. (*See* Plaintiff's Exs. 5, 6). Horridge and Jacorro also filed personal bankruptcy in 1988 to prevent the 1987 judgment from being executed against them. (*See* Plaintiff's Ex. 7). The financial statements dated October 1, 2001, April 28, 2003, February 10, 2004, and February 18, 2004 also requested information about previous bankruptcies, (*see* Plaintiff's Exs. 21, 33, 49, and 50), but Horridge did not disclose his previous bankruptcies in answering those questions. Horridge knew that affirmatively lying about his bankruptcy history or failing to disclose his previous bankruptcies in these financial statements made the information he provided materially false. Horridge intended Whitney

28

Bank to act on the representations that he submitted in connection with documents submitted to procure over $4 million in loans to Air Ambulance.  Whitney Bank reasonably relied upon the representations about the absence of Horridge's bankruptcy history in making the March 19, 2002 loan, in making the November 20, 2002 loan, in making the May 21, 2003 loan, in making the July 25, 2003 loan, and in renewing, consolidating, and extending the previous debt and adding $1 million in additional loan proceeds on May 7, 2004.  It was reasonable for Whitney Bank to rely on statements that the individual who owns and operates the entity applying for millions in loans and who offers a personal guaranty as security for those loans has no prior bankruptcy history.  There was credible testimony at trial that had Whitney Bank known of the bankruptcy filing, it would have investigated.  The investigation would have led to a discovery of the previous judgment against Horridge, which included findings of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act, and his attempt to avoid collection by filing bankruptcy.  The investigation would have led Whitney Bank to decline to make the 2002 initial loan and to decline to add to the loan amounts in 2003.  Whitney Bank reasonably relied on Horridge's misrepresentation about the absence of any prior bankruptcy history, to its detriment.  By misrepresenting the absence of any bankruptcy history, Horridge fraudulently induced Whitney Bank to make the 2002 and 2003 loans.

The merger clauses contained in the Commercial Note, the Loan Agreement, and the Restated Guaranty did not preclude Whitney Bank from relying on the misrepresentations contained in the financial statements submitted in connection with the earlier loan

applications.  As a result, the merger clauses do not negate the reliance element of Whitney Bank's fraud claim.

This court previously held that the damages proximately caused by Whitney Bank's reliance on Horridge's fraudulent misrepresentations made in 2004 about the purpose of the $1 million additional loan, the misrepresentation as to the absence of any investigation, and the misrepresentation that the aircraft complied with FAA requirements, are the $1 million in new loan proceeds and the losses resulting from the renewal and extension of the prior outstanding loans.  (Docket Entry No. 181 at 21–22).  Having now determined that Whitney Bank has a valid fraud claim based on the misrepresentations about the absence of any bankruptcy history, this court concludes that the damages proximately resulting from Horridge's misrepresentations are the unpaid amounts of the loans originally made in 2002 and 2003 and renewed and extended in 2004, as well as the additional $1 million in new loan proceeds added in 2004.   The actual damages resulting from the fraudulent misrepresentations are the deficiency remaining on the loans after the foreclosure sale.  The damages proximately caused by Horridge's fraud are $4,651,408.19 as of February 2, 2007, plus $620.19 per day from February 2, 2007 until the date of judgment.  (*See* Docket Entry No. 181 at 15; Plaintiff's Ex. 152 (calculating the deficiency amount on the loan)).

The amount of exemplary damages remains unchanged.  Under Texas law, exemplary damages are recoverable when clear and convincing evidence shows that the harm is the result of fraud.  TEX. CIV. PRAC. & REM. CODE § 41.003(a) (Vernon 1997).  Texas law limits the amount of exemplary damages.  *Id.* at § 41.008(a).  In determining the amount of

30

exemplary damages, the trier of fact considers: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the wrongdoer's degree of culpability; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. *Id.* at § 41.011(b); *see also Fed. Nat'l Mortgage Ass'n v. Okeke*, No. H-04-4405, 2006 WL 355241, at *3 (S.D. Tex. Feb. 14, 2006); *Wright v. Blythe-Nelson*, No. 399-cv-2522D, 2004 WL 1923871, at *7 (N.D. Tex. Aug. 26, 2004); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). Considering all the factors, this court previously awarded Whitney Bank  $1 million in exemplary damages against Horridge.  Whitney Bank has not requested that the amount of exemplary damages be amended in light of a finding of fraud based on the misrepresentations regarding the bankruptcy filings, and this court does not find that any amendment of the exemplary damages is necessary.  Accordingly, the court confirms its conclusion of law that Whitney Bank is entitled to $1 million in exemplary damages against Horridge.

The conclusions of law set forth in the Original Findings and Conclusions, (Docket Entry No. 181), remain unchanged by the foregoing analysis with respect to the following areas and/or sections of the Original Findings and Conclusions:

- Whitney Bank's entitlement to judgment on its breach of contract claims for the deficiency remaining on the May 7, 2004 loan, pre- and post- judgment interest, and reasonable attorneys' fees.  (Docket Entry No. 181 at 20).

- Whitney Bank's entitlement to judgment dismissing Horridge's counterclaims for fraud and tortious interference.  (*Id.*).

- The conclusions on the fraud claim with respect to representations Horridge made in the loan documents as to the purpose of the loan, the condition of the

collateral, and the absence of any investigation into the companies.  (*See id.* at 20–22).

- • Whitney Bank's entitlement to and the amount of exemplary damages.  (*Id.* at 22–23).

- • The conclusions with respect to the fraudulent transfer claim.  (*Id.* at 23–25).

## VI.   Order

As previously noted, a plaintiff may bring actions based on both fraud and breach of contract, but a court cannot award damages for the same injury for both fraud and breach of contract.  (Docket Entry No. 181 at 25 (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006))).  A plaintiff must choose a theory of recovery and "is entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict." (*Id.* (citing *Tony Gullo Motors I*, 212 S.W.3d at 304)).  Whitney Bank sought, and this court has provided,  clarification of the fraud damages "before Whitney is required to make its election of remedies."  No later than November 6, 2007, Whitney Bank is ordered to elect the theory of recovery it intends to pursue and to submit a proposed final judgment.

SIGNED on October 25, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge